UNITED STATES of America, Appellee

v.

Adolph JACKSON, Appellant

No. 97–3122.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 29, 1998.

Decided Oct. 23, 1998.

Antoini M. Jones argued the cause and filed the brief for appellant.

Rachel Carlson Lieber, Assistant United States Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, United States Attorney, John R. Fish-

er, Mary-Patrice Brown, Richard L. Edwards and Mary B. Murphy, Assistant United States Attorneys.

Before EDWARDS, Chief Judge, and WALD and SENTELLE, Circuit Judges.

SENTELLE, Circuit Judge:

Adolph Jackson entered a plea of guilty to one count of Possession with Intent to Distribute Five Kilograms or More of Cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii)(II). He appeals from a judgment imposing a sentence of 132 months. Jackson argues that the district court improperly concluded that an earlier incident of uncharged conduct four years before the offense of conviction was in the same "course of conduct" and was thus appropriately included as "relevant conduct" for the purposes of determining the base offense level under U.S.S.G. § 1B1.3. We reject appellant's argument and affirm his sentence.

## I. Background

Adolph Jackson was arrested as a result of a reverse sting operation facilitated by the cooperation of Rayful Edmond. Edmond, a purported drug lord, had been convicted of various federal narcotics offenses in 1990, and received concurrent sentences of life without parole. *See United States v. Edmond,* 52 F.3d 1080 (D.C.Cir.1995). While in prison, Edmond continued his drug activity by using the facility's visitation and telephone privileges to broker drug transactions between individuals in Colombia and in Washington, D.C. Edmond's telephone calls from prison were tape recorded consistent with Bureau of Prison policy, and in 1994, federal investigators became aware of his illegal activities and commenced an investigation. Edmond agreed to plead guilty to conspiracy to distribute cocaine, and began to cooperate with the government. He represented to his former contacts in the illicit drug industry that he had resumed his pattern of brokering large drug deals between parties in D.C. and in Colombia, with the government providing the cocaine in reverse sting operations.

In 1996, Adolph Jackson became the target of one such reverse sting. Edmond claimed that he had arranged a large drug transaction between Jackson and the Colombians in 1992. The government planned the sting so that Jackson would be led to believe that he was transacting with the same Colombian parties he had in 1992, with Edmond as intermediary. The sting was successful, and Jackson was arrested on August 7, 1996. A two-count indictment was filed the next day, charging him with one count of Conspiracy to Possess with Intent to Distribute Five Kilograms or More of Cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(ii)(II), and one count of Possession with Intent to Distribute Five Kilograms or More of Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II). On November 1, 1996, Jackson entered a plea of guilty to the second count of the indictment.

On April 1 and 2, 1997, the district court held a sentencing hearing which focused on whether Jackson's alleged 1992 drug transaction would be considered "relevant conduct" for the purpose of establishing his base offense level under U.S.S.G. § 1B1.3. The government presented two witnesses at the hearing, Rayful Edmond and Detective Gonzalez, a D.C. police officer. Edmond testified regarding the 1992 transaction and its similarity to the feigned 1996 transaction. He explained that the Colombians with whom he arranged his transactions from prison were "Chickie" and "Negro" Trujillo–Blanco, and that a representative of the Colombians named Memo would typically meet with the D.C. parties in New York City to complete the transaction. According to Edmond, he arranged a transaction between defendant and the Colombians in 1992. Edmond testified that the 1992 transaction involved the purchase of 25 kilograms of powder cocaine by defendant and his then partner, Marcus Haynes, who was the subject of a separate reverse sting. Jackson and Haynes allegedly received the cocaine from Memo in a meeting in New York City in July or August of 1992. Edmond further testified that while he was not present at the actual transaction, prior and subsequent conversations with the parties involved confirmed that the transaction had been completed. According to Edmond,

Jackson and Haynes were not entirely satisfied with Memo as intermediary due to late changes he had made in the deal. Edmond testified that shortly after the 1992 transaction, Chickie was killed, and Negro went into hiding, so that further transactions with them were not possible at that time. Portions of Edmond's testimony were supported by recordings of his phone conversations from prison.

Both Edmond and Detective Gonzales testified regarding the 1996 sting. Edmond explained that he contacted Jackson in 1996 and led him to believe that contact with Negro had been reestablished and that there was a new intermediary with whom a deal could be transacted. Detective Gonzales was the undercover officer who posed as the "new Memo" in the 1996 transaction. In his testimony at the sentencing hearing, Gonzales explained that he structured the 1996 transaction to parallel the 1992 transaction. Gonzales testified that he met with Jackson in a Newark hotel, and that Jackson did not seem confused or surprised when Gonzales mentioned Chickie and Negro during that meeting. The 1996 transaction involved ten kilograms of cocaine.

The district court concluded that the government had established that the 1992 transaction was relevant conduct under U.S.S.G. § 1B1.3. Since the 1992 conduct was deemed relevant, the defendant was responsible not only for the ten kilograms involved in the 1996 transaction, but for the twenty-five kilograms involved in the 1992 transaction. This increased defendant's base offense level from 32 to 34. After an adjustment for acceptance of responsibility, the defendant had an offense level of 31. With a criminal history of 2, this led to a sentencing range of 121 to 151 months. The judge imposed a sentence of 132 months, from which Jackson appeals.

Jackson argues that his alleged 1992 drug transaction should not have been used to determine his base offense level under § 1B1.3. He makes two arguments: first, that more than a simple preponderance should have been required to establish the 1992 transaction, and second, that the 1992 transaction is too distant in time to be considered part of the same course of conduct as the 1996 offense.

## II. Standard of Proof at Sentencing

■ The preponderance standard for factual determinations at sentencing is suggested by the Guidelines themselves, see U.S.S.G. § 6A1.3 (Policy Statement) commentary. The Supreme Court has held that the application of the preponderance standard at sentencing generally satisfies due process. *McMillan v. Pennsylvania*, 477 U.S. 79, 91–92, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986); *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997). In addition, this court has consistently stated that only a preponderance is required for proof of facts at sentencing. For example, in *United States v. Lam Kwong–Wah*, 966 F.2d 682 (D.C.Cir.1992), we held that a preponderance standard was acceptable regarding a sentencing court's finding of scienter with respect to the amount of drugs involved in conspiracy or distribution, even if the amount could have a significant impact on the length of the sentence. *See also United States v. Pinnick*, 47 F.3d 434, 437 (D.C.Cir.1995) (government must establish acts constituting relevant conduct by a preponderance); *United States v. Gottfried*, 58 F.3d 648, 652 (D.C.Cir.1995) (same). Although appellant argues that the evidence of the 1992 transaction was insufficient to prove the incident by even a preponderance, we have considered this argument, and find it to be without merit.

■ To support his argument that a higher standard of proof should have been required, appellant cites *United States v. Shonubi*, 103 F.3d 1085 (2d Cir.1997), which held that a more rigorous standard should be employed where the disputed conduct will significantly enhance a sentence. As on two prior occasions on which appellants have raised this same argument, we find that the facts before us do not involve any extraordinary circumstances so that we need not determine whether a higher standard could ever apply. *See Lam Kwong–Wah*, 966 F.2d at 682, and *United States v. Toms*, 136 F.3d 176 (D.C.Cir.1998). Even if a higher standard might be required where an extremely

large difference in sentences is at stake, this is not such a case. 21 U.S.C. § 841(b)(1)(A)(ii) provides a ten-year minimum sentence for the offense on which defendant entered a plea. The 132-month sentence imposed in this case was only twelve months more than this ten-year minimum. In contrast, the relevant conduct determination in *Shonubi* led to an increase of at least fifty-four months. *See* 103 F.3d at 1087. Furthermore, treating Jackson's 1992 conduct as relevant increased his base offense level by only two points. A two-point increase was also at issue in *Watts,* 117 S.Ct. at 634. There, the Court acknowledged the divergence of opinion among lower courts regarding whether relevant conduct which would dramatically increase the sentence would require a higher standard of proof. *Id.* at 637. However, the Court held that there were no such exceptional circumstances in that case, so that proof by a preponderance was enough, and the Court had no need to address whether a higher standard would ever be required. *Id.* at 638. We reach an identical conclusion here.

### III. The Relevant Conduct Determination

Appellant's argument that the 1992 transaction is too distant in time to be considered part of the same course of conduct as the 1996 offense under U.S.S.G. § 1B1.3 is more troubling. However, applying the law of Guideline sentencing to the facts of record, we conclude that this argument also fails.

A. The Course of Conduct Test

U.S.S.G. § 1B1.3 defines "relevant conduct" for determining an offender's base offense level. Subsection (a)(1) provides that unless otherwise specified, the base offense level shall be determined based on acts or omissions occurring "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." For certain specified offenses for which the sentence depends substantially on quantity, primarily certain property, tax, fraud, and drug offenses, the Guidelines allow consideration of a broader range of conduct. *See* U.S.S.G. § 1B1.3 background note; *United States v. Boney,* 977 F.2d 624, 635 (D.C.Cir.1992) (conduct relevant to drug offense is "sweepingly defined"). The rationale for allowing consideration of such conduct is that where quantity is an important consideration, it is important to "take into account the full range of related conduct," U.S.S.G. § 1B1.3 background note, "regardless of the number of counts that are alleged or on which a conviction is obtained." *Id.* Accordingly, subsection 1B1.3(a)(2) provides that for these specified offenses, relevant conduct includes acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." Subsection 1B1.3(a)(2) applies only to offenses which U.S.S.G. § 3D1.2 would require to be grouped for sentencing purposes. *See* U.S.S.G. § 1B1.3(a)(2); *United States v. Lancaster,* 968 F.2d 1250, 1257 (D.C.Cir.1992). The drug offenses for which appellant was sentenced are among those specified by § 3D1.2, *see* U.S.S.G. § 3D1.2 (requiring grouping of offenses covered by U.S.S.G. § 2D1.1); U.S.S.G. § 2D1.1 (covering violations of 21 U.S.C. § 841(a) and (b)(1)), and are therefore subject to this broader definition of relevant conduct.

The Guideline's application notes address the question of what constitutes a "course of conduct" or a "common scheme" within the meaning of U.S.S.G. § 1B1.3(a)(2). Application note 9(A) provides that "[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" U.S.S.G. § 1B1.3 application note 9(A). Application note 9(B) provides that offenses that do not qualify as a common scheme or plan may nonetheless be within the "same course of conduct" if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 application note 9(B). Factors appropriate to determining whether or not offenses are part of the same course of conduct include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time

interval between the offenses." *Id.* When one of the factors is absent or weak, a stronger presence of at least one of the other factors is required. *Id.; Pinnick,* 47 F.3d at 438. Whether or not offenses are part of the same course of conduct may depend on the nature of the offenses. For example, application note 9(B) states that a failure to file tax returns in three consecutive years would be considered a course of conduct, since such returns are only required at yearly intervals.

The district court in this case concluded that the 1992 and 1996 transactions were part of the same course of conduct. The court recognized that the four-year interval between the 1992 and 1996 conduct made the time element weak, but concluded that the strong degree of similarity between the two drug transactions made them part of a single course of conduct.

## B. Standard of Review

■ A sentencing court's determination that particular conduct is relevant to the offense of conviction is in many cases a factual question that we review for clear error. *See, e.g., Pinnick,* 47 F.3d at 438. However, in this case, the district court's decision that the 1992 offense was relevant conduct involved not only a factual question, but an application of § 1B1.3 to the facts found. Congress has provided that a district court's application of the Guidelines to the facts must be given "due deference." 18 U.S.C. § 3742(e). We have explained this standard of review as "fall[ing] somewhere between *de novo* and 'clearly erroneous,' a standard of review that reflects an apparent congressional desire to compromise between the need for uniformity in sentencing and the recognition that the district courts should be afforded some flexibility in applying the guidelines to the facts before them." *United States v. Kim,* 23 F.3d 513, 517 (D.C.Cir.1994), *quoted in United States v. Broumas,* 69 F.3d 1178, 1180 (D.C.Cir.1995). The deference that is due depends on the nature of the question presented. *Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Because the question of whether conduct in a given case constitutes a "course

of conduct" is inherently fact intensive, we afford due deference in the present case.

## C. Analysis

■ Appellant argues that[*] the four-year time interval between the 1992 and 1996 transactions renders both the regularity prong and the temporal prong of the test very weak, and that similarity alone cannot justify a finding of a course of conduct. While we have stated that no single factor is dispositive in determining whether earlier offenses are part of the same course of conduct, *Pinnick,* 47 F.3d at 438, we have not previously considered a situation where a course of conduct was found primarily on the basis of strength in a single factor. Similarly, U.S.S.G. § 1B1.3 application note 9(B) provides that when one factor is absent, a stronger showing in at least one of the other factors is required, but does not address situations where two of the factors are absent or weak.

Traditionally, what conduct to consider in sentencing was left to the sentencing judge's discretion. Before the imposition of the Guidelines, it was a recognized principle that " 'a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' " *United States v. Grayson,* 438 U.S. 41, 50, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) (quoting *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972)). The information considered in pre-Guidelines sentencing sometimes included unconvicted conduct which was temporally remote. *See United States v. Campbell,* 684 F.2d 141, 154 (D.C.Cir.1982) (upholding sentence based in part on conduct prior to the statutory limitations period). The Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551 *et seq.,* 28 U.S.C. §§ 991–998, channeled the trial judge's discretion, and correspondingly, established more meaningful appellate review. However, the development of the Guidelines "did not alter a court of appeals' traditional deference to a district court's exercise of its sentencing discretion." *Koon,* 518 U.S. at 97, 116 S.Ct. 2035. In enacting the Sentencing Reform Act, Congress gave

no indication that the sentencing judge was to ignore any information under the Guidelines regime that previously would have been relevant. *United States v. Wishnefsky,* 7 F.3d 254, 256 (D.C.Cir.1993). In fact, the Sentencing Reform Act recodified without comment a longstanding statutory provision that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661, *formerly* 18 U.S.C. § 3577. In light of this, we find no justification for crafting rigid time limits on the conduct a sentencing judge may consider in making a course-of-conduct determination.

Congress's failure to impose defined limits on what may constitute a course of conduct certainly does not mean there are no limits, only that they must be determined on a case-by-case basis. While we find nothing in § 1B1.3 which necessarily precludes a district court judge from finding a course of conduct based primarily on similarity, we must consider whether it was appropriate to do so in the present case. Here, the "degree of similarity" between the 1992 and 1996 deals is strong. Each was brokered by Rayful Edmond; each involved, either actually or in Jackson's perception, a transaction between Jackson and the Trujillo–Blancos; each involved a meeting with an intermediary in the United States; and each involved the transfer of large quantities of cocaine. However, the four-year interval between the two transactions makes the time and regularity prongs quite weak.

Previous cases addressing the appropriateness of finding a course of conduct have not dealt with situations combining such strong similarity with such a long time interval. A number of cases involving lengthy time intervals have held that the earlier offense was not part of the same course of conduct, but in each of those cases, the similarity was weaker than in this case. In *United States v. Mullins,* 971 F.2d 1138 (4th Cir.1992), the court held that where uncharged insurance fraud was more than six months prior to the wire fraud which was the offense of convic-

tion, a sufficiently strong showing of similarity had not been made out to consider the incidents part of a course of conduct. In *United States v. Kappes,* 936 F.2d 227, 231 (6th Cir.1991), the court concluded that it was clear error for the district court to find a defendant's obtaining his postal job under false pretenses in 1983 part of the same course of conduct as making false statements on an occupational injury form in 1989. *United States v. Fermin,* 32 F.3d 674, 681 (2d Cir.1994), *implicitly overruled on other grounds, Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), held that drug transactions from 1983 to 1985 were not relevant conduct to a 1990–1991 conspiracy, but noted that a high degree of similarity had not been established. *See also United States v. Hill,* 79 F.3d 1477, 1484 (6th Cir.1996) (holding that where two drug transactions are separated by more than one year, a relevant conduct finding generally may not be premised on the sole similarity that the transactions involved the same drug); *United States v. Barton,* 949 F.2d 968, 969 (8th Cir.1991) (suggesting that 1983 conduct was "too distant and dissimilar" to 1989 conduct to be used in sentencing).

Other cases have found a course of conduct under § 1B1.3 despite a significant lapse of time, but in these cases, the time and regularity prongs were stronger than in this case. In *United States v. Wishnefsky,* 7 F.3d 254 (D.C.Cir.1993), we held that where embezzlement occurred continuously from 1980–1990, the entire period constituted one "course of conduct" and could be taken into account in setting the base offense level, even though the statute of limitations had run on all but the 1987–1990 embezzlement. In *United States v. Moore,* 927 F.2d 825, 828 (5th Cir. 1991), the court noted that "[t]here is no separate statute of limitations beyond which relevant conduct suddenly becomes irrelevant," but the time lapse in that case was only seven months, and there was intervening activity so that the "regularity" prong was not entirely absent. In *United States v. Nunez,* 958 F.2d 196 (7th Cir.1992), the court found that cocaine sales between 1986 and 1988 were relevant conduct to a 1990 offense, but in this case as well, there was arguably

some regularity, in that there were multiple sales in the earlier period.

The case most similar to this one is *United States v. Cedano–Rojas*, 999 F.2d 1175 (7th Cir.1993). In that case, the Seventh Circuit upheld the finding of a course of conduct where there was a single temporally separate transaction. Defendant Cedano–Rojas was convicted of one count of possession with intent to distribute cocaine as a result of an undercover operation. Cedano–Rojas had bought cocaine from "Rios" in 1987 and 1988. In 1988, Rios' supplier was arrested, and he could not find a replacement. In 1990, in attempting to get a new supplier, Rios was arrested and began to cooperate with the government. He led the defendant to believe he had a new supplier, and arranged a transaction which led to Cedano–Rojas' arrest. The offense of conviction occurred in 1990. At sentencing, the 1987–1988 conduct was treated as part of the same course of conduct. The Seventh Circuit upheld this result, noting that "[a] respite is unlikely to be fatal in the finding of a course of conduct if the interruption was not the choice of the players." *Id.* at 1180.

While the facts of *Cedano–Rojas* are similar to those here, the time interval in the present case is two years longer. A four-year time interval makes the temporal factor weak, and in many cases might be difficult for another factor to outweigh. Two incidents four years apart are hardly the prototypical "course of conduct." However, as application note 9(B) indicates, the nature of the offense is a relevant consideration in determining whether there is a course of conduct. U.S.S.G. § 1B1.3 application note 9(B). In this case, the transactions in which Jackson was involved were extremely large international cocaine deals. It is hardly reasonable to anticipate that such transactions would be carried out with the same frequency as might be expected from smaller drug transactions. In addition, as in *Cedano–Rojas,* the lapse of time does not evidence a voluntary cessation of activity by the defendant. Here, Jackson's Colombian suppliers, the Trujillo–Blancos, were allegedly unavailable between 1992 and 1996, making transactions with them during that time impossible.

In addition, Edmond's continued imprisonment surely imposed at least some constraint on the number of deals he could broker for the defendant. Therefore, giving due deference to the trial judge's decision, and in light of the extreme similarity between the 1992 and 1996 conduct in this case, we hold that the district court was justified in considering the 1992 conduct in establishing Jackson's base offense level under U.S.S.G. § 1B1.3. We make clear, however, that this result rests heavily on the nature of the 1992 and 1996 transactions and their extreme similarity. A "course of conduct" is not a limitless concept, and the limits are approached in this case.

## IV.   Conclusion

Given the nature of the 1992 and 1996 transactions, and their extreme similarity, the district court's decision that Jackson's 1992 conduct was relevant conduct under U.S.S.G. § 1B1.3 was justified. We therefore reject appellant's arguments, and affirm the sentence imposed by the district court.