Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued March 19, 2003                    Decided May 23, 2003

Nos. 01-3026 & 01-3096

UNITED STATES OF AMERICA,
APPELLEE

v.

DANIEL STOVER, *A/K/A* BUCK, *A/K/A* BLADE,
AND VERNON MCCALL,
APPELLANTS

————

Nos. 01-3029 & 01-3037

UNITED STATES OF AMERICA,
APPELLEE

v.

WALTER HENRY III, *A/K/A* MONEY, *A/K/A* HENRY WALKER
AND CHARLES HARRISON,
APPELLANTS

————

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

Appeals from the United States District Court
for the District of Columbia
(Nos. 98cr00235-04, -05, -06, -08)

————

*Stephen C. Leckar*, appointed by the court, for appellant Henry, *Sandra G. Roland*, Assistant Federal Public Defender, for appellant McCall, *Paul H. Zukerberg*, for appellant Stover, and *Mary M. Petras*, appointed by the court, for appellant Harrison, argued the causes. With them on the joint briefs was *A. J. Kramer*, Federal Public Defender.

*Walter Henry III* filed pro se briefs.

*Deborah Watson*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *William D. Braun*, Attorney, U.S. Department of Justice, and *William J. O'Malley, Jr.*, Assistant U.S. Attorney.

Before: EDWARDS, HENDERSON, and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed *Per Curiam*.

*Per Curiam*: In these consolidated appeals, four appellants, Charles Harrison, Walter Henry, Vernon McCall, and Daniel Stover, raise numerous challenges to their convictions and sentences for drug conspiracy and possession with intent to distribute. After reviewing the challenged pre-trial, trial, post-trial, and sentencing rulings of the District Court, we affirm the District Court on all but two of its judgments. We vacate the sentences of Henry, Harrison, and McCall and remand to the District Court for a new calculation of the drug quantity for which each is responsible. We also remand McCall's sentence for a new finding on the scope of his conspiratorial agreement. We have accorded all of appellants' arguments full consideration after careful examination of the record, but this opinion addresses only those arguments that warrant discussion.

## I.    BACKGROUND

This case involves a conspiracy to import heroin from Thailand and other Asian countries and distribute it in the Washington D.C. and Baltimore areas. The evidence presented at trial established that, from 1995 to 1998, Nuri Lama, a citizen of Nepal residing in New York, arranged to import heroin from Asia into the United States, and delivered the heroin to appellant Walter Henry. Henry stored the drugs at his mother's home in Capitol Heights, Maryland, and then sold the heroin to appellant Charles Harrison, who was the "hub." Harrison "cut" or diluted the heroin and sold it to a network of dealers in the Washington D.C. and Baltimore areas, including appellant Vernon McCall. Daniel Stover, Harrison's right-hand man, also "cut" heroin, packaged and delivered it, and collected payment for it. Stover also operated a "stash house" for Harrison in Fort Washington, Maryland.

The Government's investigation of the heroin conspiracy produced tapes of more than 250 telephone conversations intercepted on telephone lines belonging to Lama, Henry, and Harrison. On various dates in June and July 1998, the Federal Bureau of Investigation ("FBI") searched the homes of Harrison, McCall, Henry (who lived with his mother), and Michael Ball (another distributor in the conspiracy); the FBI also searched McCall's car and Stover's stash house. The searches recovered heroin, guns, cash, documents connecting individuals to the conspiracy, small baggies of heroin for street distribution, cutting agents, cutting and packaging equipment, and scales.

On May 4, 1999, appellants and others were charged with one count of conspiracy to possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 846. Henry was also charged with two counts of possession with intent to distribute heroin in violation of 21 U.S.C. § 841. Stover and Harrison were also charged with one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956.

From October 20, 1999 to January 12, 2000, all appellants were tried in a jury trial before the District Court. Before trial, Lama pled guilty to having engaged in a conspiracy and provided evidence against appellants. Stover and McCall were convicted of conspiracy to possess with intent to distribute. Henry was convicted of possession with intent to distribute. Stover was acquitted of the money laundering conspiracy count. The jury was unable to reach a verdict as to Henry and Harrison on the drug conspiracy count, and as to Harrison on the money laundering conspiracy count. From September 11 to October 20, 2000, a retrial on the drug conspiracy count against Henry and Harrison took place. The District Court dismissed the money laundering conspiracy count against Harrison. The jury returned a guilty verdict as to both Henry and Harrison on the drug conspiracy count. Henry and Harrison were sentenced to life imprisonment, Stover to 360 months, and McCall to 235 months.

Appellants now appeal, seeking review of pre-trial, trial, post-trial, and sentencing rulings of the District Court.

## II.  ANALYSIS

### A.  Stover Verdict Jury Note

Stover appeals his conviction on the ground the District Court failed to act on a note from the jury that, he alleges, cast doubt on its guilty verdict. The jury returned a verdict convicting Stover of conspiracy on January 7, 2000; the jury was polled and the verdict found unanimous. On January 12, after the jury informed the court it was hung on the conspiracy count against Henry, the jury sent out the following note:

> During deliberations for Daniel Stover, the question of what pieces of evidence his fingerprints were on came up. Some thought one way, some another. After research, it was found that some who voted based on these supposed facts were wrong. Some want to redeliberate on this issue, some don't. How

do we, if possible, rectify this matter?  Seat 4, Seat 11, Seat 6, Seat 8, Seat 12.  Can we meet privately on this matter?

Trial Transcript ("Tr."), *reprinted in* 1 Joint Appendix ("JA") in 01-3026, at 5781.  The judge informed the lawyers who were present he intended to tell the jurors "they can't do anything about judgment having been entered as to Stover, and whatever post-trial motions are filed will be filed."  Tr., 1 JA in 01-3026, at 5782.  He then summoned the jurors and informed them: "I have your notes, and I have decided to terminate your deliberations."  Tr., 1 JA in 01-3026, at 5791.  Stover's counsel, who had not been present, later filed a motion to reconvene the jury for additional deliberation, which the court declined to grant.  We review the District Court's actions for abuse of discretion.  *See United States v. Campbell*, 684 F.2d 141, 151-52 (D.C. Cir. 1982) ("When confronted with allegations of irregularity in the jury's pro-ceedings, the trial judge has broad discretion 'to determine what manner of hearing, if any, is warranted.'  . . .  The trial court correctly determined that no further inquiry was re-quired and the judge did not abuse his discretion in respond-ing to these allegations as he did.") (quoting *United States v. Wilson*, 534 F.2d 375, 379 (D.C. Cir. 1976);  citing *United States v. Parker*, 549 F.2d 998, 1000 (5th Cir. 1977)).  The District Court below acted within its discretion and in accord with Federal Rule of Evidence 606(b).

Rule 606(b) provides:

**(b) Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influ-encing the juror to assent to or dissent from the verdict or indictment or concerning the juror's men-tal processes in connection therewith, except that a juror may testify on the question whether extrane-ous prejudicial information was improperly brought

to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

FED. R. EVID. 606(b). "Federal Rule of Evidence 606(b) is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences." *Tanner v. United States*, 483 U.S. 107, 121 (1987). This rule precludes taking testimony from the jurors in this case regarding their belated misgivings as it did under similar circumstances in *United States v. Dakins*, 872 F.2d 1061, 1065 (D.C. Cir. 1989).

In *Dakins* the jury returned a partial verdict against one defendant, the verdict was read aloud in the courtroom, the jury was polled and unanimously assented to the verdict, and the judge instructed the jurors to resume deliberating on the two remaining defendants. At day's end one juror informed the judge she had a "question about the decision that was made on Mr. Dakins." 872 F.2d at 1064. At the judge's request, she wrote the question on a piece of paper which the judge sealed, unread, in an envelope. When the envelope was opened on appeal, the enclosed paper revealed the juror had developed doubts about the sufficiency of the Government's proof of Dakins's guilt. Upholding the trial court's treatment of the note, this court explained:

> Juror No. 10's second-thoughts were manifested hours after the poll had been conducted, and the jury had been returned to its deliberations by the court. The verdict had been read into the court record. Upon the 12th juror's assent, also upon the record, it was "recorded" for purposes of Rule 31(d). The jury's decision had become a final verdict, and no juror could thereafter be allowed to impeach it. Fed.R.Evid. 606(b) prohibits jurors from giving evidence about any matter pertaining to their verdicts except extrajudicial influences. Juror No. 10's unsealed note revealed that her misgivings derived

> from her post-verdict reflections about the weight of the government's proof at trial, and not from an extrajudicial influence.

872 F.2d at 1065. Rule 606(b) similarly bars eliciting juror testimony here to impeach the verdict against Stover, which was unanimously rendered, as the contemporaneous polling confirmed, five days before the judge received the note. *See also Tanner*, 483 U.S. at 121 (relying on Rule 606(b) to uphold trial judge's refusal to consider juror testimony regarding drug and alcohol use by jurors during deliberation to impeach verdict). Nonetheless, Stover argues for a different result based on other court decisions. We find none of them applicable here.

First, Stover cites two cases from other circuits in which a judge changed a mistaken verdict based on juror testimony: *United States v. Dotson*, 817 F.2d 1127 (5th Cir. 1987), *vacated in other respect on rehearing*, 821 F.2d 1034 (5th Cir. 1987), and *Attridge v. Cencorp Div. of Dover Techns. Int'l, Inc.*, 836 F.2d 113 (2d Cir. 1987). In each of those cases, however, the mistake lay in recording the wrong verdict after the jury had unanimously assented to a different one. Neither case involved post-verdict juror misgivings or any sort of inquiry into the juror's deliberations.

Stover also cites *United States v. Benedict*, 95 F.3d 17 (8th Cir. 1996), and *United States v. DiLapi*, 651 F.2d 140 (2d Cir. 1981), to assert that a *partial* verdict, such as the one entered here, becomes irrevocable only if the judge advises the jury of such a result in advance. In *Dakins*, however, the court expressly rejected the argument that "the court erred in accepting the jury's partial verdict without first having specially instructed the jury as to a partial verdict's finality":

> We believe no special instruction to have been necessary, however. Fed.R.Crim.P. 31(b) expressly permits the jury to return a verdict "with respect to a defendant or defendants as to whom it has agreed." It says nothing to suggest that such a verdict, once recorded, is open to reconsideration, and the case law is to the contrary. *See, e.g., United States v.*

> *Hockridge,* 573 F.2d 752, 759 (2nd Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 86, 58 L.Ed.2d 112 (1978).
>
> Appellant cites none, and we are aware of no precedent requiring a special finality instruction. Indeed, it is not even required that the jury be instructed about its right to return a partial verdict at all. *See, United States v. DiLapi,* 651 F.2d 140 (2d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 1428, 71 L.Ed.2d 648 (1982). The trial record here makes clear that the jury sent the note indicating that it had "reached one verdict" on its own initiative. That verdict was then entered on a verdict form, announced by the foreperson in open court, and orally confirmed by each and every juror – the same solemn formalities that attend a verdict which ends an entire case. We find no reason for the jury to have thought its partial verdict any less final than it would have been had the jury been rendering a verdict as to all of the defendants.

872 F.2d at 1064. Stover offers no persuasive reason to reach a different conclusion here. Stover also asserts, without supporting authority, that the court erred in not summoning Stover's lawyer and responding to the jury note in open court in his presence. Such action, however, would have availed Stover naught as Rule 606(b) would nonetheless have foreclosed altering the verdict based on the note or additional juror testimony. *Cf. United States v. Stansfield,* 101 F.3d 909, 916 (3d Cir. 1996) ("Had the district court here questioned the three jurors prior to the jury's discharge, the jurors still would have been incompetent by virtue of Rule 606(b) to impeach the jury's verdict.").

## B. Ouaffai's Testimony

At the separate trial of Henry and Harrison, the Government called Adelhamid Ouaffai. Ouaffai testified on direct examination that on several occasions he had sold Harrison a large number of ziploc baggies and chemicals to cut heroin;

that Harrison had told him he was a heroin dealer; and that Harrison had said he received heroin from Chinese suppliers.

Harrison's counsel attempted to impeach Ouaffai by having him acknowledge prior statements he made to the FBI on May 4, 1998, statements that were supposedly inconsistent with his testimony on direct or cross-examination. In particular, Ouaffai conceded that he told the FBI he had met Harrison only three to seven times, although he testified on direct that he had met with Harrison more than ten times; although Ouaffai testified on cross-examination that Harrison always arrived in a blue car, he admitted telling the FBI that Harrison always arrived in "some non-descript American car"; Ouaffai testified on cross-examination that he dealt with "hundreds" of drug dealers, but he conceded telling the FBI that Harrison was the only drug dealer with whom he was involved. Harrison's counsel then asked a series of questions suggesting that Ouaffai's testimony was not credible because he wanted a plea agreement.

On redirect examination, the Government sought to introduce other statements from the FBI report, as well as portions of the statement of facts from Ouaffai's July 5, 2000, plea agreement, consistent with Ouaffai's testimony on direct examination. Some of the statements addressed the inconsistency regarding the number of drug dealers that Ouaffai knew; most of the statements only reiterated Ouaffai's testimony on direct examination. In response to a defense objection, the Government argued, and the District Court agreed, that the statements were admissible under FED. R. EVID. 801(d)(1)(b) to rehabilitate Ouaffai. (The judge instructed the jurors that they could use prior consistent statements to "judg[e] the credibility of the witness . . . but not as proof that what was said in the earlier statement was true." Tr., 2 JA in 01-3037, at 474.) Harrison contends that the statements should have been excluded.

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Rule 801 provides that a prior consistent statement is not hearsay if it is "offered to rebut an express or implied

charge against the declarant of recent fabrication or improper influence or motive." FED. R. EVID. 801(d)(1)(B). The Supreme Court has interpreted the rule as requiring that the offered statement be made before there was a motive to fabricate. *Tome v. United* States, 513 U.S. 150 (1995). According to Harrison, Ouaffai's prior consistent statements were made after he had a motive to fabricate – because Ouaffai had already begun cooperating with the authorities – and therefore were not admissible.

Rule 801(d)(1)(B) applies only when a prior consistent statement is offered for its truth. *See* FED. R. EVID. 801(d)(1)(B) advisory committee's note; *Tome*, 513 U.S. at 157. But statements may be introduced for reasons other than their truth. Suppose a witness testifies on direct examination to fact X and then on cross-examination is asked about his statement, made sometime before trial, suggesting that he believed not-X. Could the party who called the witness ask him to verify his prior consistent statements even though the witness made them after he had a motive to shade the truth? We think the answer is yes, and so do other courts of appeals. *See United States v. Simonelli*, 237 F.3d 19, 26-27 (1st Cir. 2001); *United States v. Ellis*, 121 F.3d 908, 919-20 (4th Cir. 1997); *United States v. Pierre*, 781 F.2d 329, 331-33 (2d Cir. 1986); *United States v. Harris*, 761 F.2d 394, 399-400 (7th Cir. 1985); *see also United States v. Rubin*, 609 F.2d 51, 69-70 (2d Cir. 1979) (Friendly, J., concurring); *cf. United States v. Tarantino*, 846 F.2d 1384, 1411 (D.C. Cir. 1988); *Coltrane v. United States*, 418 F.2d 1131, 1140 (D.C. Cir. 1969) (decided before the adoption of the Federal Rules of Evidence). These prior statements would not be offered for the truth of the matter asserted – fact X – and therefore would not need to satisfy Rule 801(d)(1)(B). They would be introduced to show that the witness did not give statements on direct that were inconsistent with what he had said before. *See Coltrane*, 418 F.2d at 1140. The prior statements would be admissible on this basis because of the cross-examination. They would be relevant, under FED. R. EVID. 401, to a matter of consequence – namely, that the witness made inconsistent statements about fact X, which would tend to undermine his

credibility. *See, e.g.*, 22 Charles Alan Wright & Kenneth W. Graham, Federal Practice and Procedure: Evidence § 5177, at 143 (1978). In evaluating whether evidence is relevant, "the judge must take account of the relationship of the evidence offered to the evidence already admitted. Some matters are properly provable only because the opposing party has made them such." *United States v. Russo*, 104 F.3d 431, 433 (D.C. Cir. 1997).

Here, the only prior statements the Government introduced on redirect that clarified an apparent inconsistency were those concerning whether Ouaffai knew drug dealers other than Harrison. These statements were properly admitted (though not on the ground the District Court recited). The rest of Ouaffai's prior statements were not targeted at rebutting the inconsistencies probed during cross-examination, but served only to show that most of Ouaffai's testimony on direct examination was consistent with his earlier statements. It thus was error to admit them. *See* Fed. R. Evid. 402.

The error does not require reversal. An objecting party must state the "specific ground of objection, if the specific ground [is] not apparent from the context." Fed. R. Evid. 103(a)(1). Although Harrison objected several times to the admission of Ouaffai's prior consistent statements, not once did he state the grounds of the objections. Nor is it apparent from the record that the ground of the objections was relevance. *Cf. United States v. Boyd*, 55 F.3d 667, 671 n.3 (D.C. Cir. 1995). Accordingly, we review for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Weaver*, 281 F.3d 228, 231 (D.C. Cir. 2002). Under this standard of review, a defendant must show, *inter alia*, that the error affected his "substantial rights" – that is, that the error affected the outcome of the trial. *United States v. Olano*, 507 U.S. 725, 734 (1993). Harrison has made no such showing. Other evidence, including a significant number of recorded conversations obtained through wiretaps, established Harrison's membership in the conspiracy.

There is another issue concerning Ouaffai's testimony. Federal Rule of Evidence 614(b) permits a judge to "interro-

gate witnesses." Judges enjoy broad latitude regarding the type of questions asked and the extent of their questioning. *See United States v. Tilghman*, 134 F.3d 414, 416 (D.C. Cir. 1998). It is an abuse of discretion, however, for a judge to ask questions signifying that he finds the witness believable. *See id.* Harrison contends the trial judge crossed the line in the following exchange:

> The Court: I have just one question. You understand, Mr. Ouaffai, before your sentencing by Judge Legg in Baltimore, I have the opportunity to talk to the Judge. Is there anything you've said to this jury here today that is not the truth, the whole truth, and nothing but the truth?
>
> Def. Counsel: Objection, Your Honor.
>
> The Court: Overruled.
>
> Ouaffai: I said the truth, Judge.
>
> The Court: Anything you want to change about any of your testimony?
>
> Ouaffai: No, Your Honor.

No reasonable juror would interpret the court's questions as indicating that it believed Ouaffai. If anything, the questioning suggests that the court disbelieved Ouaffai and was permitting Ouaffai one last opportunity to change his testimony after being reminded of his oath and of his impending sentencing. Although questions from the bench indicating the court's disbelief of a witness are also improper, *see Tilghman*, 134 F.3d at 416, the error, if there was any, worked to Harrison's advantage. Furthermore, even if jurors interpreted the court's questions as an endorsement of Ouaffai's credibility, the court corrected that misimpression by admonishing the jury to "examine [Ouaffai's] testimony with caution and weigh it with great care" because Ouaffai had "a motive to testify falsely" to secure a lighter sentence, Tr., 2 JA in 01-3037, at 476. *See United States v. Sobamowo*, 892 F.2d 90, 95 n.3 (D.C. Cir. 1989); *cf. Tilghman*, 134 F.3d at 421.

### C. Tape Recordings

Henry and Harrison claim the District Court erred in admitting two videotapes and two audiotapes. The videotapes capture Lama and undercover FBI Agent Eric Bryant engaging in drug deals and negotiating a future exchange of heroin for cocaine. On one of the videotapes, Lama tells Agent Bryant that they should refer to drugs as clothes. The audiotapes are of a conversation between Lama and Agent Bryant in which Lama states that he is going to Washington, D.C., for a drug deal.

The defendants objected that the tapes were irrelevant and hearsay. The court overruled the objection, finding that the recorded transactions were admissible as co-conspirator statements, *see* FED. R. EVID. 801(d)(2)(E), and, presumably, relevant as such. When the defendants later renewed their objection, the court concluded that the recordings were admissible to establish that Lama was a drug dealer. Harrison and Henry maintain that the court abused its discretion in admitting the recordings. *See United States v. Evans*, 216 F.3d 80, 85 (D.C. Cir. 2000).

A statement offered against a defendant is not hearsay if it was made by a co-conspirator "during the course and in furtherance of" a conspiracy between the declarant and the defendant. FED. R. EVID. 801(d)(2)(E). According to the Government, because the indictment alleged that Lama distributed heroin to "Henry and other coconspirators," any heroin that Lama distributed during the life of the conspiracy was in furtherance of the conspiracy. The argument is not well-taken. The Government must prove by a preponderance of the evidence that 801(d)(2)(E)'s requirements have been met. *See United States v. Beckham*, 968 F.2d 47, 51 n.2 (D.C. Cir. 1992); *see also Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). An indictment may not be offered as evidence to satisfy that burden. *See Brown v. Dep't of Justice*, 715 F.2d 662, 667 (D.C. Cir. 1983). The only affirmative evidence purporting to show that the transaction between Lama and Agent Bryant was in furtherance of the conspiracy involving Henry and Harrison was that Lama eventually sold to Henry

the same heroin that he had previously sought to peddle to Agent Bryant. But this establishes only that Lama engaged in drug deals with both Agent Bryant and Henry. We see no basis to draw the further inference that Lama's deals with Agent Bryant and Henry were parts of the same conspiracy. *See United States v. Mathis*, 216 F.3d 18, 24 (D.C. Cir. 2000); *Tarantino*, 846 F.2d at 1393. The District Court thus erred in admitting the recordings on this ground.

The Government has another reason why admission was proper. It argues that the recordings did not constitute hearsay, but were admissible as "verbal acts" to the extent they demonstrated that Lama was a drug dealer and provided context to other conversations in which Lama and his co-conspirators used clothing terminology to refer to drugs. To these ends, the recordings were clearly relevant: they made more probable the existence of the facts of consequence that Lama supplied drugs to Henry and Harrison (by showing Lama was a drug dealer) and that the conspirators distributed drugs (by showing that their mentions of clothes referred to drugs). *See* FED. R. EVID. 401.

The "verbal acts" doctrine does not apply here. According to the advisory committee, a "verbal act" is a statement that "affects the legal rights of the parties." FED. R. EVID. 801 advisory committee's note. Such acts are limited to statements that have independent legal significance, such as contractual offers or inter vivos gifts. *See* 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 801.11[3] (2d ed. 1997). Neither Lama's negotiations with Agent Bryant nor Lama's statement that they should refer to drugs as clothes falls within this definition. What the Government appears to mean by the term "verbal acts" is that the recordings were offered for something other than their truth. The veracity of the negotiations between Lama and Agent Bryant was irrelevant. All that mattered was that Lama engaged in those negotiations. *See United States v. Roach*, 164 F.3d 403, 410 (8th Cir. 1998).

As to using the recordings to establish context, the Government seems to be saying that all out-of-court statements offered for context do not constitute hearsay. However, that a statement provides context to other evidence does not mean that the statement is not hearsay. All relevant evidence provides context to the events underlying the charged crime. *See United States v. Bowie*, 232 F.3d 923, 928-29 (D.C. Cir. 2000). The question is whether the statement is offered for its truth. *See* FED. R. EVID. 801(c); *United States v. Jordan*, 810 F.2d 262, 264 (D.C. Cir. 1987). Here, the Government introduced Lama's statement that Agent Bryant and Lama should refer to drugs as clothes as evidence of the fact that Lama used clothing terminology to refer to drugs in other conversations. The statement is not probative of that fact unless the Government offered the statement for the truth of its content. The jury, using the statement, could infer that Lama and his co-conspirators referred to drugs as clothes only from the fact that Lama and Bryant referred to drugs as clothes – that is, through the statement's content. *Cf. United States v. Sesay*, 313 F.3d 591, 599-600 (D.C. Cir. 2002). The statement thus was hearsay, and its admission was erroneous. *See* FED. R. EVID. 802.

The error, however, was harmless. Prosecution expert Thomas Tyrone testified that Lama and his co-conspirators used various code words, including clothing terms, to refer to drugs. The defendants did not object to this testimony. Accordingly, equivalent information would have been available to the jury. The error thus did not affect the trial's outcome. *See* FED. R. CRIM. P. 52(a). *See also United States v. Graham*, 317 F.3d 262, 267 (D.C. Cir. 2003).

## D. Drug Quantity Findings

Henry, Harrison, and McCall appeal the District Court's findings at sentencing as to the drug quantity for which each was responsible. Appellants argue that the District Court made two errors in calculating the drug quantity for the purposes of sentencing. First, the trial court assumed that all of the heroin in the conspiracy was of at least 79% purity. Second, the trial court multiplied by four the total quantity of

heroin that Lama delivered to Henry over the course of the conspiracy, on the theory that the heroin would have been diluted and multiplied fourfold for street distribution. We find that the District Court clearly erred in the second of these steps in calculating the drug quantity.

At sentencing, the District Court noted that the record showed that Lama had delivered at least 11.05 kilograms of pure heroin to Henry over the course of the conspiracy. *See* Findings of Fact and Conclusions of Law for Sentencings ("Sentencing Findings"), 5 JA in 01-3026, at 289. However, the District Court found that Henry and Harrison were responsible for more than triple that quantity of heroin, 39.4 kilograms. *See id.* at 291. The District Court arrived at this quantity pursuant to the following method of calculation.

First, the District Court noted that a July 10, 1998, search of Henry's mother's house had recovered heroin at 79% purity. *See id.* at 289-90. Because this was the lowest purity heroin recovered in the investigation of this drug conspiracy, the District Court used this level of purity as "the standard by which the remainder of the drugs should be judged." *See id.* n.13. The District Court thus assumed that all the heroin that Lama delivered to Henry throughout the conspiracy was 79% pure heroin. The court then reasoned that, with the exception of the 1.6 kilograms of heroin seized in the investigation that was never diluted, the heroin (the remaining 9.45 kilograms) must have been converted to street quality heroin and distributed on the Washington D.C. streets. *See id.* at 290. The court concluded that, in being converted, the heroin would have been "cut" twice – that is, diluted and multiplied fourfold. This conclusion was based on the testimony of the Government's drug expert, Metropolitan Police Department Detective Tyrone Thomas, who testified that 20% purity was the strength that could be sold on the street without undue risk of harm to the heroin user. *See id.* at 291. Thus, 79% pure heroin would have to be diluted and multiplied fourfold to bring it down to the 20% strength suitable for sale to customers on the street. *See id.*

The court thus multiplied the 9.45 kilograms of heroin by four, to get 37.8 kilograms, and then to that quantity added the 1.6 kilograms that were never diluted, to arrive at a total of 39.4 kilograms of heroin for which Henry and Harrison were each responsible. *See id.* Under § 2D1.1(c)(1) of the U.S. Sentencing Guidelines, which applies to 30 kilograms or more of heroin, this quantity resulted in a base offense level of 38 for Henry and Harrison. *See id.* The quantity for which McCall was held responsible during the shorter period of his participation in the conspiracy was calculated accordingly. *See id.* at 318.

In reviewing appellants' challenge to the District Court's drug quantity findings, this court reviews the factual findings supporting a sentence under the Sentencing Guidelines for clear error. *United States v. Graham*, 162 F.3d 1180, 1183 (D.C. Cir. 1998). Facts at sentencing must be proven by a preponderance of the evidence. *United States v. Jackson*, 161 F.3d 24, 26 (D.C. Cir. 1998). We reverse a factual finding supporting a sentence under the Sentencing Guidelines "only if we are left with a definite and firm conviction that it is mistaken." *United States v. Toms*, 136 F.3d 176, 187 (D.C. Cir. 1998) (citation and internal quotation marks omitted).

Appellants contend that there was an error in each step of the District Court's calculation of the drug quantity. First, appellants dispute the District Court's assumption that all of the heroin that Lama delivered to Henry was of the uniformly high quality of 79% purity as the heroin recovered in the July 10, 1998 search of Henry's mother's house. Appellants point out that apart from that heroin, nobody ever testified about the purity level of the heroin that Lama supplied. Appellants contend that the evidence compels a finding that the remainder of the deliveries of heroin were of lower quality. *See* Appellants' Br. in 01-3026, at 65-70.

For example, appellants point out that Lama testified that he agreed to deliver heroin to Henry for $80,000/kg. But upon Lama's April 1997 shipment of heroin, Henry complained of the inferior quality of the shipment. Lama then reduced his price to Henry from $80,000/kg to approximately

$47,000/kg. Appellants infer that the price reduction must have been because the heroin was of lower quality. A bigger price reduction was given for Lama's March 9, 1998 delivery of heroin. Henry paid between $25,000/kg to $32,000/kg and expressed concern to Lama over the quality. *See* Appellants' Br. in 01-3026, at 66-68. The Government disputes that Henry paid such a low price, pointing to Lama's testimony that this payment was merely an installment of the total price. *See* Appellee's Br. in 01-3026, at 110 n.35. Around March 27, 1998, Henry again complained in intercepted phone calls about the shipment's purity. *See* Appellants' Br. in 01-3026, at 69-70.

We do not think that appellants have offered any plausible evidence that the purity levels of heroin during the course of the conspiracy were lower than 79%. Henry's recorded complaints about the quality of the deliveries and Lama's price reductions do not establish that the quality of any shipment was lower than 79%, merely that Henry was unhappy with the purity level of the shipments. We do not even know whether Henry considered 79% good or poor quality. Appellants present no record evidence of the price per kilogram of 79% pure heroin, from which we could infer the quality of the reduced-price shipments. Henry may have complained and Lama may have reduced the price, simply because the heroin was not of the highest quality – that is, more than 79%.

Second, appellants argue that, even assuming that all of the heroin was 79% pure, it was not routinely diluted fourfold to 20% for street sale. Appellants cite evidence presented at trial that the heroin packaged for street distribution that was actually seized consisted of 746 baggies of 27-29% pure heroin. Since these seized baggies were the only evidence of the purity level of the heroin distributed on the street, appellants contend that the heroin for street sale was not multiplied fourfold, but rather by a factor of approximately 2.8. *See id.* at 70-71; Reply Br. in 01-3026, at 25-26.

We find this second argument convincing. The only evidence of heroin packaged and ready for street distribution

actually seized in the investigation was 27-29% pure, not 20% pure. Assuming heroin of 79% purity, this indicates that the heroin was not diluted fourfold, but by a factor substantially smaller than four. In the face of this argument, the Government in its brief cites Detective Thomas' testimony at trial that 28% pure heroin "is much closer to what drug dealers are capable of injecting," Tr., 1 JA in 01-3026, at 445, and that dealers purchase drugs on the advice of a "tester ... an old-time heroin user who has the body tolerance to accept high doses of heroin," Tr., 1 JA in 01-3037, at 91. The Government argues that the sentencing court could have concluded that the baggies of 27-29% heroin seized were "testers" that did not represent the purity of the heroin that was routinely distributed at the street level. *See* Appellee's Br. in 01-3026, at 117-18. This argument, however, was not presented to the District Court and cannot be considered for the first time on appeal. *See United States v. Hylton*, 294 F.3d 130, 135 (D.C. Cir. 2002). In any event, it seems very unlikely that the *746 baggies* of 27-29% pure heroin found were all testers for other dealers rather than for street sale, and no Government witness even suggested this.

The Government also cites a recorded conversation between McCall and Harrison, in which McCall said "I usually get four step done not three," to argue that we could infer that the drugs were multiplied fourfold. *See* Appellee's Br. in 01-3026, at 112 (citing 2 JA in 01-3026, at 195). However, the sentencing court did not rely upon this recorded conversation in finding that the heroin was multiplied fourfold. Thus, we do not consider it.

We find that, in light of the 27-29% purity of the baggies packaged for street distribution that were actually seized in this case, the District Court had little basis for assuming that the heroin was diluted to 20% purity and multiplying the quantity by four. The District Court committed clear error in so doing. This fourfold multiplication of the drug quantity improperly increased Henry's, Harrison's, and McCall's base offense levels under U.S.S.G. § 2D1.1. We vacate appellants' sentences and remand to the District Court for a new calculation of the drug quantity.

### E. Scope of McCall's Agreement

Appellant McCall challenges the District Court's finding at sentencing that he was responsible, with Henry, Harrison, and Stover, for the full scope of the conspiracy rather than just for the drugs that he personally purchased from Harrison. We find that two of the four factors on which the District Court relied in concluding that McCall was responsible for the full scope of the conspiracy were erroneous, and we remand to the District Court for a new finding as to the scope of McCall's conspiratorial agreement.

McCall's participation in the conspiracy ran from April 17 to July 10, 1998. At sentencing, the Government argued that McCall was equally responsible with Henry, Harrison, and Stover for all of the heroin that Lama sold to Henry during the period of McCall's membership. *See* Gov't's Proposed Findings of Fact and Conclusions of Law, 5 JA in 01-3026, at 238-39. McCall argued that the scope of his agreement during the 12 weeks of his participation was limited to an agreement to buy heroin from Harrison that he could cut, package, and sell on the street, and that he was not involved in the Lama-Henry or Henry-Harrison transactions. *See* Defendant McCall's Memorandum in Aid of Sentencing, 5 JA in 01-3026, at 145-48.

The District Court rejected the contention that the scope of McCall's participation was limited merely to buying drugs from Harrison and distributing them on the street. The court found that McCall

> operated at a level in this conspiracy which made the distribution of the heroin delivered to Henry by Lama in 1998 reasonably foreseeable to him and within the scope of jointly undertaken criminal activity.... McCall was in fact a full participant in this conspiracy and is thus responsible for its entire scope during his membership.

Sentencing Findings, 5 JA in 01-3026, at 316. The court based this finding on four facts, which "all combine to persuade the Court that the defendant's agreement was not so

limited as he now asserts": (1) McCall "accompanied Harrison to Baltimore for Harrison's early discussions with Dytania Cannady concerning Mr. Harrison's Baltimore efforts including the initial discussions with Troy Schumpert"; (2) The very high "purity, packaging, and amount of some of the drugs recovered in the search of McCall's premises" indicated that "McCall was not only purchasing drugs from Harrison and Stover that were already cut and packaged but was also being supplied with uncut drugs which McCall would then cut and package"; (3) McCall "had direct knowledge that Harrison distributed heroin to others"; and (4) McCall had tried to contact Troy Schumpert to collect money owed to Harrison. *Id.* at 316-17. The District Court's conclusion that McCall was a full member of the conspiracy affected his sentence by increasing McCall's base offense level pursuant to U.S.S.G. § 2D1.1.

In the case of jointly undertaken criminal activity, the Sentencing Guidelines provide that, for the purpose of determining the base offense level, the court must take into account "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). *See also United States v. Booze*, 108 F.3d 378, 381 (D.C. Cir. 1997) (stating that the district court must "ascertain the quantity of drugs that could be attributed to appellant by determining whether the acts at issue were within the scope of the conspiracy in which appellant had agreed to participate, and whether the acts were foreseeable to him"). The scope of a defendant's conspiracy "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3, comment. (n.2). "A jury verdict convicting the defendants of participation in a single conspiracy does not obviate the need for . . . individualized findings [as to the scope of a defendant's conspirational agreement] by the sentencing court." *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995). The District Court "must make 'individualized findings . . . linking each appellant's scope of participation in the conspiracy with the quantum of drugs attributed to [him].'" *Id.* (quoting

*United States v. Edmond*, 52 F.3d 1080, 1105 (D.C. Cir. 1995)).

McCall contends that he should have been held responsible only for the drugs that he personally purchased from Harrison, because he was not involved in the Lama-Henry or Henry-Harrison sales; had never met or spoken with Stover; and had no dealings with any Baltimore conspirators, other than meeting with Cannady a few times and attempting to collect a drug debt from Schumpert on Harrison's behalf. McCall contends that the District Court erred with respect to two of the four factors on which the court based its finding that McCall was responsible for the entire scope of the conspiracy rather than simply a limited agreement with Harrison. *See* Appellants' Br. in 01-3026, at 84-90.

First, McCall claims, *and the Government concedes*, that the District Court's finding that McCall accompanied Harrison to Baltimore for early discussions with Cannady or Schumpert was not directly supported by the evidence at trial and was therefore erroneous. *See id*. at 85-86; Appellee's Br. in 01-3026, at 132-33.

Second, McCall contends that the court's finding that McCall had direct knowledge that Harrison distributed heroin to others was erroneous, because there was no evidence that McCall knew, met, or spoke with any of Harrison's other customers, with the exception of Cannady. The intercepted phone conversations in which McCall participated did not involve any conspirator other than Harrison. *See* Appellants' Br. in 01-3026, at 86. According to McCall, he "was in the dark about everyone except his source, Charles Harrison." Reply Br. in 01-3026, at 31.

The Government cites three-way telephone calls between Stover, Harrison, and McCall, *see* Appellee's Br. in 01-3026, at 138-39, but McCall points out – without refutation from the Government – that Stover's presence on the line was unknown to McCall, *see* Reply Br. in 01-3026, at 32. Additionally, the Government cites telephone "conversations, in which the major participants in the conspiracy, including McCall, consulted about . . . the various searches," Appellee's Br. in 01-3026, at 140, but McCall points out that he informed only

Harrison of the search of his own apartment and said nothing about any searches of other premises, *see* Reply Br. in 01-3026, at 33. The Government is unable to point to any concrete evidence that McCall had "direct knowledge" of Harrison's distribution of heroin to others. We conclude that the District Court's finding that McCall had such direct knowledge cannot stand on the record before us.

Finally, McCall argues that the remaining two factual findings on which the District Court relied – that McCall bought a high quantity of high purity heroin with the intention of cutting and packaging it for distribution, and that he attempted to collect from Schumpert on a drug debt owed to Harrison – are insufficient to support the District Court's conclusion that McCall's agreement to purchase heroin from Harrison encompassed the full scope of the conspiracy. *See id.*

The District Court relied on four factors to conclude that McCall was responsible for the full scope of the conspiracy. The Government concedes that the first of these factors – that McCall accompanied Harrison to Baltimore for early discussions with Cannady or Schumpert concerning Harrison's Baltimore efforts – was erroneous. We find that the third factor – that McCall had direct knowledge that Harrison distributed heroin to others – is not supported by the evidence or any finding of the District Court. We are unsure whether the two factors that remain – the high purity and quantity of the heroin found in McCall's premises, and McCall's attempt to collect a drug debt from Schumpert – are by themselves sufficient to support the conclusion that McCall was responsible for the full scope of the conspiracy. We do not know what the District Court would conclude as to the scope of McCall's agreement, once erroneous factors are removed from consideration. We therefore remand to the District Court for a new finding not inconsistent with this opinion as to the scope of McCall's agreement.

## F. McCall's Role in the Conspiracy

Next, McCall challenges the two-point managerial enhancement he received under U.S.S.G. § 3B1.1(c). Section 3B1.1 provides:

§ 3B1.1. AGGRAVATING ROLE

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The District Court found McCall was a manager in the conspiracy because he "participated with Harrison's drug-related activities beyond the point of merely purchasing drugs," specifically noting that he "operated in close proximity to Harrison, he handled drugs of a very high purity, and he assisted Harrison with some of Harrison's drug-related activities." Sentencing Findings, 5 JA in 01-3026, at 319. In assigning McCall a managerial role, the court invoked Application Note 9 to U.S.S.G. § 2D1.1 which states:

The purity of the controlled substance, particularly in the case of heroin, may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs. As large quantities are normally associated with high purities, this factor is particularly relevant where smaller quantities are involved.

Under this provision, the District Court properly considered the 86% purity level of the 12.1 grams of heroin seized (along with 9.5 grams of a cutting agent) from McCall's apartment as probative of his managerial role in Harrison's distribution ring. McCall may properly be viewed as a manager who received drugs from Harrison, prepared them (in some cases by cutting them to a salable level) for distribution on the street through his network of "runners" and afterward collected the proceeds from the runners. *See United States v. Strothers,* 77 F.3d 1389, 1393-94 (D.C. Cir. 1996) (affirming upward supervisory adjustment for two conspirators who "directed and profited from numerous drug sales carried out by subordinate 'runners'"); *cf. Graham* 162 F.3d at 1184 (reversing § 3B1.1(b) enhancement where record was "devoid of any evidence that [defendant] received extra compensation for serving as a manager, disciplined any lower ranking member of the conspiracy, altered the conspiracy's policies or procedures in any respect, provided guidance to senior managers or subordinates, issued any orders on behalf of the conspiracy, or otherwise held himself out as a link in the chain of command"). Accordingly, we find no error in the two point enhancement the court assigned McCall under U.S.S.G. § 3B1.1(c).

### III. CONCLUSION

For the foregoing reasons, we affirm the District Court on all but two of its judgments. First, because we find that the District Court erred in calculating the drug quantity, we vacate the sentences of Henry, Harrison, and McCall, and remand for a new calculation of the drug quantity. Second, because two of four factors supporting the District Court's finding on the scope of McCall's conspiratorial agreement were erroneous, we remand to the District Court for a new finding on the scope in the absence of those erroneous factors. We have considered all of appellants' other claims, including those not discussed in this opinion, and find them to be without merit.