Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 16, 2003      Decided November 14, 2003

No. 02-3089

UNITED STATES OF AMERICA,
APPELLEE

v.

LAWRENCE SEILER,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 00cr0054–02)

*Joseph Murtha* argued the cause and filed the brief for appellant.

*Suzanne Grealy Curt*, Assistant U.S. Attorney, argued the cause for appellee.  With her on the brief were *Roscoe C. Howard Jr.*, U.S. Attorney, and *John R. Fisher, Roy W. McLeese III*, and *Steven J. Durham*, Assistant U.S. Attorneys.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: HENDERSON, TATEL, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Having pleaded guilty to conspiracy and wire fraud in connection with a scheme to bilk a government agency, appellant challenges his sentence, arguing that the actions of co-conspirators for which the district court held him responsible were neither reasonably foreseeable nor in furtherance of the conspiracy that he agreed to join. Because we find no clear error, we affirm.

## I.

Appellant Lawrence Seiler owns Eastern Tech Manufacturing Corporation, an electronics assembly business. In 1996, he and William Powell, a buyer for Boeing Information Services, devised a scheme to defraud the National Aeronautics and Space Administration. Boeing was a NASA contractor, and Powell had responsibility for buying goods and services from subcontractors that Boeing would then sell to NASA.

Seiler's and Powell's scheme worked as follows: Powell solicited bids from various subcontractors for goods that NASA needed. Once Powell identified the lowest bid, he told Seiler to have Eastern Tech buy the goods from that bidder at the price offered. Eastern Tech then offered to sell the goods to Boeing at a price above what Eastern Tech had paid. Powell accepted Eastern Tech's offer on Boeing's behalf after falsely reporting that it was the lowest bid. Boeing then paid Eastern Tech, and Seiler sent a check for half the profits (half the difference between the actual lowest bid and Eastern Tech's bid) to Powell. According to the government, Seiler and Powell cheated NASA of $67,698.06.

At the same time that he ran this scheme with Seiler, Powell operated a similar scheme with one Timothy McLatchy, who owned Inroads Computer Services. Like Seiler, McLatchy had his company sell goods to Boeing at inflated prices and then split the profits with Powell. On four occasions, Seiler laundered kickback checks that McLatchy wrote to Powell by depositing them into Eastern Tech's bank

account and then writing checks to Powell. Each time, Seiler charged Powell $100. The government calculated that the Powell-McLatchy scheme cost NASA $65,950.39.

A third group of fraudulent transactions involved Powell's own fictitious company, Eastern Manufacturing (EM). In these transactions, Powell had EM submit inflated bids instead of using Seiler's or McLatchy's company. The government charged that Seiler was at least minimally involved in these transactions as well, and calculated that the losses from them totaled $31,060.19.

After a grand jury indicted Seiler for his role in these schemes, he pleaded guilty to one count each of conspiracy and wire fraud. At Seiler's sentencing hearing, the district court, after listening to testimony from both the government's case agent and Seiler, found that Powell's and McLatchy's actions in carrying out all three groups of transactions were foreseeable to Seiler and in furtherance of the conspiracy that he agreed to join. The court therefore concluded that all three groups were "relevant conduct" within the meaning of U.S. Sentencing Guidelines section 1B1.3. Noting repeatedly that it disbelieved Seiler's testimony, the court accepted the government's calculation of the total losses as $164,708.64 and then used that figure to find that the proper sentencing range, after making several adjustments, was 12 to 18 months. The court sentenced Seiler to 366 days in prison and ordered him to pay, as restitution, thirty percent of the losses, or $49,412.59.

On appeal, Seiler argues that the district court erred in finding that the second and third groups of transactions (i.e., those between McLatchy and Powell, and those in which Powell used EM) were relevant conduct to be considered in fixing his sentence. Seiler also asserts that the losses attributable to the first group of transactions—in which his own company submitted inflated bids—total "at most" $33,849.03. Appellant's Br. at 17.

## II.

We review the district court's relevant-conduct determination and loss calculation only for clear error. *See United*

*States v. Pinnick*, 47 F.3d 434, 437 (D.C. Cir. 1995) (relevant conduct); *United States v. Leonzo*, 50 F.3d 1086, 1088 (D.C. Cir. 1995) (loss calculation). We thus will not upset the district court's findings unless we are "left with the definite and firm conviction that a mistake has been committed." *Boca Investerings P'ship v. United States*, 314 F.3d 625, 630 (D.C. Cir. 2003) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)) (internal quotation marks omitted).

### *Relevant Conduct*

In determining the proper sentence in a criminal case, a district court takes into account all relevant conduct. U.S. Sentencing Guidelines section 1B1.3(a)(1)(B) provides that in conspiracy cases, relevant conduct includes "all reasonably foreseeable acts and omissions [committed by] others in furtherance of the jointly undertaken activity . . . ."

Claiming that the Powell-McLatchy transactions were neither reasonably foreseeable nor in furtherance of the conspiracy that he agreed to join, Seiler asserts that he never met McLatchy or knew that Powell and McLatchy were operating their own scheme. He admits that he cashed four checks that Inroads (McLatchy's company) wrote to EM (Powell's company), but insists that this is insufficient to support the district court's finding that the Powell-McLatchy scheme was relevant conduct. Seiler laundered the proceeds of several of the Powell-McLatchy transactions, however, thereby making the fraud harder to detect. Although Seiler asserted at his sentencing hearing that Inroads actually intended to make the laundered checks payable to Eastern Tech (his company) and not EM (Powell's company), and that Inroads had simply committed an error when drawing the checks, he admitted that Inroads owed Eastern Tech nothing when it wrote the four checks. Seiler also claimed—inconsistently—that he simply cashed the checks as a favor to Powell, who "explained to me that he was earning that money consulting at [Inroads] and that [Inroads] did not want to put him on the books because of the 1099 issue." Setting aside the fact that (as the

government points out) this latter explanation might expose Seiler to prosecution for helping Powell evade taxes, we think that Seiler's cashing of the checks and his inconsistent explanations for doing so provide ample basis for the district court's finding that the Powell-McLatchy transactions fell within the scope of the conspiracy in which Seiler agreed to participate, rendering them relevant conduct under section 1B1.3.

Seiler also argues that the district court erred in finding that the transactions in which Powell had EM submit fraudulent bids constituted conduct relevant to his (Seiler's) sentence. In its brief, the government argues that we need not address this issue because even if the EM transactions were not attributed to Seiler, his Guidelines sentencing range would not change. At oral argument, however, the government conceded that removing those transactions from consideration would lower the restitution amount.

Seiler contends that he withdrew from the conspiracy in the summer of 1997 by ceasing to do business with Powell. This withdrawal, Seiler says, precludes a finding that the EM transactions were relevant conduct. As the government notes, however, Powell not only created EM in the summer of 1996, a year before Seiler's purported withdrawal, but also conducted transactions through EM at the same time that he ran his scheme with Seiler's company. Thus, even if Seiler withdrew when he says he did, that would not by itself take the EM transactions outside the scope of relevant conduct.

Moreover, Seiler acknowledges one occasion when Powell sent him an EM check after the summer of 1997. At his sentencing hearing, Seiler initially testified that he did not know whether that check represented the proceeds of the conspiracy—as the government contended—but then claimed that it represented the repayment of a loan he had made to Powell. The government also introduced a check that Powell had sent to Seiler several months earlier. Seiler testified that this too was a loan repayment. The district court, however, after giving the matter "close attention," did not credit this testimony. It instead accepted the government's

theory that Seiler helped Powell conduct the EM transactions and that the payments from Powell and EM represented the fruits of those transactions.

Although the evidence tying Seiler to the EM transactions is weaker than that which connects him to the Powell-McLatchy transactions (as the district court recognized), we see no basis for concluding that the court clearly erred by attributing the EM transactions to Seiler, particularly given that the court's findings rested largely on its evaluation of witness credibility. *See, e.g.*, *United States v. Hart*, 324 F.3d 740, 747 (D.C. Cir. 2003) ("[T]he district court's credibility determinations are entitled to the greatest deference from this court on appeal."). In any event, the government's theory—that Seiler was not only aware of the EM transactions, but also paid for helping Powell carry them out—was plausible. Indeed, once the district court deemed Seiler's testimony incredible, the government's theory represented the best explanation of the facts. We thus lack the requisite "definite and firm conviction" that the district court made a mistake in accepting that theory.

## *Loss Calculation*

Seiler does not challenge the district court's decision to attribute the losses stemming from Eastern Tech's inflated bids to him. Instead, he argues that those losses total no more than $33,849.03—exactly half the amount the government contends was lost. The government arrived at its figure by totaling the money that Seiler had paid to Powell and then subtracting various amounts, such as the four checks that Seiler laundered. That yielded a total of $33,849.03 in fraud-related payments from Seiler to Powell. Then, because Seiler and Powell apparently split the profits of the scheme evenly, the government doubled that figure to reach its total loss amount.

It is this doubling to which Seiler seems to object. We say seems because he says only that the proper amount is "at most" $33,849.03. *See* Appellant's Br. at 17. As the government points out, not only does Seiler provide no elaboration,

but he argued before the district court for a higher total loss amount—specifically $52,216.56. In any event, we detect no error, much less clear error. The government introduced a fax that Powell sent to Seiler, in which Powell discussed the details of one fraudulent transaction. In the fax, Powell wrote that "as you can see there is $3,000.00 profit (1500) ea." This strikes us as enough evidence to support the district court's acceptance of the government's doubling of the amount that Seiler paid to Powell, especially since Seiler offers nothing to refute it.

Seiler's sentence is affirmed.

*So ordered.*