# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 15, 2004        Decided December 21, 2004

No. 03-3100

UNITED STATES OF AMERICA,
APPELLEE

v.

LUTHER E. MELLEN, III,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00180-02)

———

*Robert C. Bonsib* argued the cause and filed the briefs for appellant Luther E. Mellen III.

*Suzanne G. Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *John R. Fisher* and *Laura A. Ingersoll*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, and HENDERSON and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

Opinion dissenting in part filed by *Circuit Judge* HENDERSON.

ROBERTS, *Circuit Judge*: Elizabeth Mellen defrauded the United States government of electronic goods worth hundreds of thousands of dollars, giving most of them to her relatives. Elizabeth's husband Luther took part in the criminal activity to the extent of joining with Elizabeth to procure a stolen laptop for his son from a previous marriage, and using some of the stolen goods around the home he shared with Elizabeth. He otherwise appears to have stayed out of the broader conspiracy. Luther was convicted of conspiracy and receipt of stolen property. At sentencing, the district court found him responsible for all the goods that flowed through the couple's home — even the goods he had neither participated in procuring nor used, but which Elizabeth passed along to her relatives. Because the government adduced sufficient evidence at trial to show that Luther agreed to participate in the conspiracy to some extent, we affirm his convictions. We vacate the sentence, however, because the record contains no indication that Luther agreed to participate to the extent of all the goods his wife brought into their home.

## I.

This is the fifth appeal stemming from a series of convictions in a conspiracy to defraud the United States Department of Education (DOE). *See United States v. Hayes*, 369 F.3d 564 (D.C. Cir. 2004); *United States v. Elizabeth Mellen*, 89 Fed. Appx. 268 (D.C. Cir. 2004) (unpublished opinion); *United States v. Morgan*, No. 03–3061 (D.C. Cir. appeal filed May 22, 2003); *United States v. Burroughs*, No. 03–3093 (D.C. Cir. appeal filed Aug. 5, 2003). Elizabeth Mellen, the central character in this story, worked as a telecommunications specialist at DOE and was responsible for installation and maintenance of telephone services throughout the Department. In that

capacity, she was authorized to place orders under service contracts DOE had with two companies, Bell Atlantic and Lucent.

At some point, Elizabeth began to use her government position to acquire goods and services for herself and her extended family, paid for by the taxpayers. Elizabeth would ask Robert Sweeney, a Bell Atlantic employee with responsibility for the DOE account, to order electronic goods for her under the Bell Atlantic contract. Sweeney would obtain the goods and deliver them to locations specified by Elizabeth. Many of these goods were initially delivered to Elizabeth's home in Mechanicsville, Maryland, though most of them ultimately wound up elsewhere in the hands of various members of her extended family.

Over the course of the conspiracy, Elizabeth ordered and Robert Sweeney delivered a wide array of items, including more than 100 cordless telephones, numerous two-way "talkabout" radios, multiple state-of-the-art computers, and even a 61-inch television set. In total, Elizabeth obtained more than $360,000 worth of equipment, all paid for by DOE. At her behest, Sweeney and Lucent employee William Cousins also performed various services for Elizabeth and her relatives, ranging from complex cable and wiring installations to lawn-mowing and other yard work.

Throughout this period, appellant Luther Mellen — also known as "Butch" — was married to Elizabeth. Luther and Elizabeth shared the home in Mechanicsville. In 1997, Luther's son from a previous marriage, Daniel Mellen, graduated from high school in North Carolina. Luther attended the graduation and gave his son a Dell laptop computer as a graduation present. The computer was later shown to have been paid for by DOE. Luther told his son that it had been picked out by Elizabeth and

asked him to write her a thank you note. The computer came with a power cord, and Daniel would testify that the power cord broke "two to five times" and that each time his father obtained a replacement cord for him. Trial Tr., Nov. 4, 2002 (A.M.), at 52–53. The power cords were also shown to have been paid for by DOE.

The government finally caught on to Elizabeth's criminal activities when one of her co-workers contacted DOE's Office of Inspector General in August 1999. In December of that year, special agents executed several search warrants, including one for the Mellens' Mechanicsville home. There, the agents found almost $65,000 in property paid for by DOE. Most of the property was located in the basement — much of it still in un-opened boxes — but agents also found items in other areas of the house. For instance, agents found a VCR in a closet containing men's clothing, a speaker phone in the master bedroom, and a number of items in a den adjoining the bedroom. *See* Trial Tr., Oct. 28, 2002 (A.M.), at 101–08; Trial Tr., Oct. 28, 2002 (P.M.), at 39.

A grand jury indicted Elizabeth and members of her extended family for conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and various other crimes. The indictment named Luther as one of the conspirators and also charged him with receipt of stolen government property, in violation of 18 U.S.C. § 641. At trial the government presented detailed evidence on how the stolen goods made their way to the Mellens' home. Robert Sweeney testified that on some occasions he would bring items to Elizabeth's office or would meet her as she was coming out of work. Elizabeth would take the goods home with her, frequently driving home with her hus-band. Sweeney acknowledged, however, that Elizabeth in-structed him to conceal the goods in a bag "so Butch couldn't see them." Trial Tr., Oct. 29, 2002 (A.M.), at 73. On other

occasions, Sweeney placed goods in the trunk of a car that belonged to one of Elizabeth's sisters, who also worked at DOE. Again, Sweeney testified that he did this "so that Mr. Mellen wouldn't know [the goods] were there." *Id.* at 89.

Sweeney also testified that on occasion he would deliver larger items directly to the Mellens' house. Sweeney had a key to the house and would drop off the goods when no-one was home. On one trip, Sweeney and a DOE employee unpacked a large Gateway computer and placed the monitor in a visible location in one of the upstairs rooms. On other trips, Sweeney left packaged computers, phones, and printers inside the Mellens' front door. Sweeney testified that he tried to arrange the goods "so Butch would not be able to see them," but that he was unable to conceal the goods completely. *Id.* at 58. On yet other trips, Sweeney placed boxes of goods in the basement or beneath a tarpaulin on the Mellens' deck.

A number of Elizabeth's family members implicated in the crimes also testified at trial. These witnesses attested to various aspects of Luther and Elizabeth's marital relationship — such as that Luther and his wife drove to work together and that she cooked for him — and one witness noted that Luther was present at a family outing where Elizabeth handed out "talkabout" radios. *See* Trial Tr., Oct. 31, 2002 (A.M.), at 76–77. Some of the witnesses, however, also testified to their belief that Luther was not involved in the conspiracy. *See* Trial Tr., Oct. 24, 2002 (A.M.), at 135 (testimony of Ray Morgan, Jr.) ("probably . . . Butch Mellen didn't have anything to do with this"); Trial Tr., Oct. 23, 2002, at 25 (testimony of special agent George Blissman) (indicating that co-defendant Jeffrey Morgan told agents that Luther "probably had no knowledge of what Eliz was [d]oing").

Luther's son Daniel testified about his father's delivery of the laptop computer and the replacement power cords. Daniel also indicated that, after the investigation of the Mellens had begun, his father advised him not to "be around" the computer. Trial Tr., Nov. 4, 2002 (A.M.), at 65. The DOE employee who had tipped off the Department about Elizabeth's activities also testified that, prior to reporting Elizabeth's activities, she had overheard several conversations between Elizabeth and Luther on the subject of acquiring a two-way radio for a boat they owned.

Finally, the government introduced evidence tending to show Luther's ability to comprehend what his wife was doing. One witness explained that, as part of his job with the Environmental Protection Agency (EPA), Luther was authorized to make government purchases and had received training in the procedures governing such purchases. The government also showed that the Mellens shared a joint checking account and that between 1997 and 1999 Luther had signed approximately 90 percent of the checks issued from the account — suggesting that Luther was in charge of the couple's finances.

In his defense, Luther introduced his EPA time, attendance, and travel records from 1997 to 1999, but did not testify. The jury found him guilty on both counts. The conspiracy verdict did not specify the amount of loss attributable to Luther, while the receipt of stolen property verdict indicated only that Luther had received government property "having a value of more than $1,000." Verdict at 2.

The district court sentenced Luther pursuant to the Federal Guidelines, under which the amount of loss affects a defendant's

sentence. *See* U.S.S.G. § 2B1.1(b)(1) (2000).[1] At the sentencing hearing, the government asked that Luther be held responsible for $364,291.30 — an amount equal to the value of all the goods stolen by his wife. Luther asked the court to limit his responsibility to the laptop computer and power cords that he had delivered to his son. The court held Luther responsible for $225,582.63 — the value of all the stolen property that had entered the Mellens' home at some point during the conspiracy. The court reasoned that Luther "knew that the property was there. He knew of his wife's involvement." Sentencing Hr'g Tr. at 18. The court also granted an upward adjustment for "more than minimal planning" pursuant to Section 2B1.1(b)(4)(A) of the Guidelines, and denied Luther's requests for a downward departure and a mitigating role adjustment. The court sentenced him to concurrent 27-month terms of imprisonment and three years of supervised release. Finally, finding that Luther had the ability to pay a fine, the court imposed one of $50,000.

Luther Mellen now appeals his conviction at trial and the district court's rulings on sentencing.

## II.

Luther first asks us to reverse his convictions for conspiracy to defraud the United States and for receipt of stolen government property. He argues that the government failed to adduce sufficient evidence to sustain either conviction. Luther also maintains that the prosecutor in summation improperly referred to his election not to testify. We find these arguments unavailing and affirm the convictions.

---

[1] The court applied the 2000 version of the Guidelines to avoid an *ex post facto* problem. *See* U.S. CONST., art. I, § 9, cl. 3; U.S.S.G. § 1B1.11(b)(1).

**A.**  The Supreme Court has emphasized that, in reviewing a conviction for sufficiency of the evidence, we must affirm if "*any* rational trier of fact could have found the essential elements beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Accordingly, we view the evidence in the light most favorable to the government and allow the government the benefit of all reasonable inferences. *United States v. William Jenkins*, 981 F.2d 1281, 1282 (D.C. Cir. 1992).  In order to sustain a conviction for conspiracy under 18 U.S.C. § 371, the evidence must show that the "defendant entered into an agreement with at least one other person" to defraud the United States; that he "knowingly participated in the conspiracy with the intent to commit the offense;" and "that at least one overt act was committed in furtherance of the conspiracy." *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (citation omitted).  In order to sustain a conviction for receipt of stolen government property, the evidence must show that defendant received, concealed, or retained government property "with intent to convert it to his use or gain, knowing it to have been . . . stolen."  18 U.S.C. § 641.

The government adduced sufficient evidence to prove both counts beyond a reasonable doubt.  In particular, the government showed that Luther took several affirmative steps to secure a stolen laptop computer for his son, and that Luther obtained the computer through the agreement and cooperation of his wife.  A reasonable jury could also readily infer that several of the stolen items found in the Mellens' home were being used by Luther as well as by his wife.

Luther argues that the evidence failed to show he knew any of these goods were stolen, and that, accordingly, he also could not have "knowingly participated" in the conspiracy.  There is ample evidence, however, from which a jury could find that Luther knew what his wife was up to. *See, e.g.*, Trial Tr., Oct.

30, 2002 (A.M.), at 51–53 (e-mail from Luther to Elizabeth, forwarding EPA's policy allowing only *de minimis* use of government property for employees' personal needs). More-over, guilty knowledge need not be proven only by evidence of what a defendant affirmatively knew. Rather, the government may show that, when faced with reason to suspect he is dealing in stolen property, the defendant consciously avoided learning that fact. See *United States v. Reyes*, 302 F.3d 48, 54–55 (2d Cir. 2002). Here, a jury could have concluded that Luther was in charge of the couple's finances, that he understood the way government purchasing works, and that he knew the nature of his wife's work. It would not take a rocket scientist to deduce that the electronic equipment Luther was himself using was stolen — an EPA employee with procurement training could do that. *See* Trial Tr., Nov. 4, 2002 (A.M.), at 103–06. Accord-ingly, when Luther agreed to take part in Elizabeth's activities — by joining to procure the laptop or by availing himself of the goods in the house — he did so with all the knowledge neces-sary to sustain his convictions.

**B.** At closing argument, the prosecutor asked the jury not to equate Luther Mellen's passive role with a lack of knowledge. The prosecutor alluded to Luther's demeanor at trial:

> You know, Luther Mellen actually has been sitting there very, very quietly all throughout this trial, writing as he's doing now, kind of tucked behind his attorney — [objec-tion] — tucked behind his attorney — [overruled] — so maybe you wouldn't notice him. Do you think he's missed anything that's gone on in this trial, Ladies and Gentlemen?

Trial Tr., Nov. 6, 2002 (A.M.), at 35. Following the summation, the court issued a curative instruction, reminding the jury that "[n]o defendant . . . is under any obligation to say anything, to testify, offer any evidence, do anything." *Id.* at 42.

Luther argues that — despite the court's curative instruction — the prosecutor's statement constitutes reversible error. As Luther points out, it is well established that the Fifth Amendment prohibits the government from highlighting a defendant's election not to testify. *See Griffin v. California*, 380 U.S. 609, 613–15 (1965). But not every improper statement provides a ground for reversal. In conformity with our sister circuits, we find error only where "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Williams*, 521 F.2d 950, 953 (D.C. Cir. 1975) (internal quotation marks omitted).

The statement at issue here does not clear this threshold. We disapprove of the prosecutor's choice of words — she should have been more careful, to avoid even raising the issue — but we cannot say that she manifestly intended to draw attention to Luther's failure to testify. The context suggests that she was instead trying to illustrate Luther's awareness of his wife's activities. Nor can we say that the jury necessarily understood the statement as a comment on Luther's election to rest on his Fifth Amendment right not to testify: the statement described Luther's physical appearance at the defense table, and not the choices he had made in litigating his case.

## III.

Luther next challenges the district court's application of the Sentencing Guidelines to the facts of his case. He argues that the court erred in finding him responsible for the value of all the stolen goods that entered the home he shared with Elizabeth. He also disputes the increase in his sentence for "more than minimal planning," and the court's decision not to grant him a downward departure or a mitigating role adjustment. Finally, Luther

challenges the court's imposition of a fine. We examine these contentions in turn.[2]

**A.** In order to sentence a defendant under the Guidelines, the district court must determine the "relevant conduct" for which that defendant is responsible. *See* U.S.S.G. § 1B1.3(a) (2000). For a conspiracy offense, the Sentencing Guidelines provide that relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1)(b). The district court's determination of relevant conduct in turn affects the specific offense characteristics — such as amount of loss — that are used to compute the sentence. *See id.* § 2B1.1(b)(1).

Here, the district court found Luther Mellen responsible for a loss of $225,582.63. Luther does not dispute that this figure accurately reflects the value of stolen goods that his wife brought into their house. What he challenges is the relevance of his *wife's* behavior in this regard to the determination of *his* sentence.

The parties disagree over the standard of review governing the district court's determination of relevant conduct. Luther

---

[2] Luther also argues that his sentence is unconstitutional in light of *Blakely v. Washington*, 124 S. Ct. 2531 (2004), since the district court's assessments of amount of loss and more than minimal planning were predicated on facts not found by the jury. Supp. Br. at 1. The Supreme Court is currently considering the applicability of *Blakely* to the U.S. Sentencing Guidelines in *United States v. Booker*, No. 04–104, and *United States v. Fanfan*, No. 04–105 (certs. granted Aug. 2, 2004). We issue our judgment today without awaiting guidance from the Supreme Court on this question because it appears, quite apart from any constitutional concerns, that Luther may be eligible for immediate release upon resentencing. To the extent necessary, the district court may apply the Supreme Court's upcoming decisions in *Booker* and *Fanfan* in the first instance at resentencing.

contends that this is a question of law to be reviewed *de novo*. Appellant's Br. at 17. The government cites *United States v. Seiler*, 348 F.3d 265 (D.C. Cir. 2003), and *United States v. Pinnick*, 47 F.3d 434 (D.C. Cir. 1995), for the proposition that we review relevant conduct determinations only for clear error. In *Seiler*, however, the dispute was a factual one as to whether the district court erred in finding that the defendant laundered money and obtained proceeds from a criminal conspiracy. 348 F.3d at 268–69. The dispute in *Pinnick* similarly involved the factual findings underlying the district court's determination of relevant conduct. 47 F.3d at 437. By contrast, where as here the relevant conduct issue involves not only a factual question, but "the district court's application of the guidelines to the facts," the proper standard is due deference — one between clear error and *de novo* review. 18 U.S.C. § 3742(e); *see United States v. Jackson*, 161 F.3d 24, 28 (D.C. Cir. 1998).

In attributing to Luther the value of property that he was not shown to have used, the district court reasoned that Luther "knew that the property was [in the house]. He knew of his wife's involvement." Sentencing Hr'g Tr. at 18. The Sentencing Guidelines, however, provide that the conduct of co-conspirators is attributable to the defendant as relevant conduct only if that conduct is both foreseeable to the defendant and "in furtherance" of the "jointly undertaken" activity. U.S.S.G. § 1B1.3(a)(1)(B) (2000). Thus, where two individuals agree to commit an offense, each becomes liable for actions taken by the other in furtherance of *that particular crime. See United States v. Saro*, 24 F.3d 283, 288 (D.C. Cir. 1994) ("Mere foreseeability is not enough: someone who belongs to a drug conspiracy may well be able to foresee that his co-venturers, in addition to acting in furtherance of his agreement with them, will be conducting drug transactions of their own on the side, but he is not automatically accountable for all of those side deals.").

13

In keeping with this rule, the Guidelines expressly require sentencing courts to determine the scope of each defendant's conspiratorial agreement. *See* U.S.S.G. § 1B1.3 cmt. n.2 (2000); *see also United States v. Childress*, 58 F.3d 693, 723 (D.C. Cir. 1995) (per curiam) (requiring district court to "spell out" its findings on scope); *United States v. Edmond*, 52 F.3d 1080, 1105–06 (D.C. Cir. 1994) (per curiam) (same). Here, the district court merely found that the presence of stolen goods in the house was foreseeable to Luther. The court did not find that Luther agreed to let his wife store them there.

Our recent decision in *United States v. Seiler* illustrates the link that is missing in this case. Seiler was convicted of conspiring with a government contractor fraudulently to mark-up bids for NASA contracts. *See* 348 F.3d at 267. One of the schemes involved Seiler's own subcontracting company, but two others did not. In affirming the district court's determination that all three schemes constituted relevant conduct, we required some evidence that Seiler agreed to participate in each. *Id.* at 268–69. For the schemes that did not involve his company, we observed that Seiler participated by laundering money in one, and that the district court reasonably concluded he was paid to help carry out the other. *Id.* Thus, for every scheme included as relevant conduct, we could point to record evidence indicating the defendant's agreement to join that aspect of the conspiracy.

There is nothing inherently implausible about the dissent's contrary "in for a penny, in for a pound" approach, but it is clearly foreclosed by our precedents. We have repeatedly held, in conformity with our sister circuits, that the scope of a defendant's particular conspiratorial agreement controls his sentencing exposure. Where the record is unclear as to whether the crimes at issue constitute a single or multiple conspiracies, the sentencing court cannot assume the former and thereby obviate

its duty to determine the scope of each defendant's agreement. *Saro*, 24 F.3d at 288–89. What is more, even when there is but a single conspiracy, and "there [is] sufficient evidence against each of the [defendants] to conclude that she or he agreed to further the purposes of this single conspiracy," we *still* require the sentencing court to determine the scope of each defendant's agreement. *Childress*, 58 F.3d at 712, 722. In *Childress*, for example, we upheld the finding of a single conspiracy, but nonetheless vacated the sentences, because the court "focus[ed] exclusively on reasonable foreseeability" without considering the extent of each defendant's *agreement*. *Id.* at 723.[3]

In this case, the government is on solid ground with respect to the laptop and any equipment used by Luther. As for the bulk of the $225,000 worth of stolen equipment, however, the government's case shows at most that Luther knew about its transitory presence in the house. As we have held, Luther cannot close his eyes to the obvious. But that evidence of knowledge does not show agreement, and such a showing is required before attributing aspects of the conspiracy to Luther as relevant conduct. *See Reyes*, 302 F.3d at 54 (Conscious avoidance doctrine "may be invoked to prove defendant had *knowledge* of the unlawful conspiracy. But we do not permit the doctrine to be used to prove intent to participate in a conspiracy").

---

[3] The dissent states that "the trial judge heard the same evidence the jury heard in convicting Luther and, having heard it, he had 'no doubt . . . whatsoever' of Luther's *participation* in the conspiracy." Dissent at 4–5 (emphasis added). What the trial judge actually said was that he had no doubt that Luther *knew* of his wife's involvement. *See* Sentencing Hr'g Tr. at 18 ("He knew of his wife's involvement in the scheme. I have no doubt about that whatsoever."). The dissent's willingness to equate knowledge with agreement — participation — repeats the error we condemned in *Childress*.

The government's case that Luther Mellen took part in the conspiracy to the extent of all the goods his wife brought into their house — as opposed to the more limited extent of the goods Luther himself used — is based on little more than the fact that Luther and his wife owned the home together. There is a significant body of law about when individuals can be held responsible for allowing their homes to be used in furtherance of a crime. *See, e.g.*, *United States v. Morillo*, 158 F.3d 18, 23 (1st Cir. 1998); *United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998); *United States v. Ronald Jenkins*, 78 F.3d 1283, 1286 (8th Cir. 1996); *United States v. Rice*, 1992 WL 240686 at *5–6 (4th Cir. 1992) (unpublished opinion). In such cases, however, the defendants either knowingly allowed non-owners to use their homes or took affirmative steps to facilitate the use of their property. In the absence of such facts, mere acquiescence in the conduct of a co-owner is insufficient to support the necessary conclusion that the defendant agreed to the illegal use of his home.[4]

---

[4] The dissent correctly states that in most of the cases cited in this paragraph — as in the present case — the defendants had participated in the conspiracy beyond merely acquiescing in the use of their homes. Dissent at 6. We do not suggest otherwise. Rather, our point is that the acts of participation in the cited cases — unlike those in the present case — show the defendants' *agreement* to the use of their homes. *See Brito*, 136 F.3d at 409 (defendant "actively participated in the storage of marijuana" in his house); *Jenkins*, 78 F.3d at 1286 ("large amounts of cocaine were stored in the basement of [defendant's] home at his instruction"); *Rice*, 1992 WL 240686 at *5–6 (defendant knowingly allowed non-owners to conduct drug transactions in and around his house). Here, Luther helped to obtain a laptop computer for his son and may have used some of the items his wife had acquired for their home, but neither of these actions shows that he agreed to her use of the home as a storage facility for thousands of dollars in stolen goods intended for her relatives.

This is particularly true here, given the significant evidence that Elizabeth tried to keep Luther from discovering the stolen goods she was storing in their home — evidence not present in any of the above cases. The government's own witnesses repeatedly testified they took steps, at Elizabeth's instruction, to prevent Luther from appreciating the scope of her crimes. This evidence indicates that while he may not have attempted to block his wife's use of what was, after all, her home too, he did not agree to such use, either. If he had agreed, what would be the point of trying to keep him in the dark about the extent of the conspiracy?

The government would have us find agreement from nothing more than the closeness of the Mellens' marriage. Thus, the government devotes a notable part of its brief to chronicling the nature of their relationship: they had been married over 15 years, they drove to work together, Elizabeth prepared meals for her husband, and so on. U.S. Br. at 33–34. We think the government's resort to such arguments indicates the weakness of its case. Homer thought there was "nothing greater and better than this — when a husband and wife keep a household in oneness of mind," *The Odyssey*, bk. VI, l. 180, but there is no evidence that the drafters of the Sentencing Guidelines assumed such an ideal could substitute for proof of an agreement to participate in a conspiracy. The record suggests that Elizabeth conducted the conspiracy and made use of the house as she pleased, without consulting her husband. The fact that he knew what she was doing does not mean he agreed to it.

The government argues that even if we reverse the district court's determination of relevant conduct for conspiracy, we should still uphold Luther's sentence. This argument is based on Luther's conviction for receipt of stolen government property: the government maintains that even if he did not agree to the scope of his wife's activities, Luther still "receiv[ed],

conceal[ed], or retain[ed]" all the stolen goods that Elizabeth brought into their house. *See* 18 U.S.C. § 641; U.S. Br. at 47–48. In essence, the government maintains that Luther violated 18 U.S.C. § 641 because he knew that his wife was storing stolen property in their house.

We do not agree. While this court has allowed juries to infer that a defendant exercises constructive possession over items found in his home, we have done so only when the record suggests the defendant himself exercised dominion and control over the items at issue. *See United States v. Wahl*, 290 F.3d 370, 376 (D.C. Cir. 2002) (noting that evidence of a gun found in a defendant's house "may not alone compel a conclusion that [defendant] had constructive possession"); *United States v. Edelin*, 996 F.2d 1238, 1241 (D.C. Cir. 1993) (per curiam) (allowing an inference of constructive possession of drugs found in a bedroom dresser based on specific evidence that defendant occupied the bedroom and exercised dominion and control over the dresser). Nothing in the record before us indicates that Luther exercised dominion and control over stolen goods Elizabeth intended for her relatives, just because she temporarily stored the goods in the house she shared with Luther.

The government cites *United States v. Sylvia Jenkins*, 928 F.2d 1175 (D.C. Cir. 1991), where we upheld the sentence of a mother convicted of trafficking cocaine found in areas of her house inhabited by her son and other, unrelated individuals. In *Jenkins*, as here, the incriminatory evidence was stored largely out of defendant's view, but — unlike this case — the record contained no suggestion that the other participants were actively hiding it from her. *Id.* at 1179. In addition, police found ammunition in a bedroom occupied solely by Jenkins, and we held that a jury could infer guilt based on the theory that guns and drugs go together. *See id.* ("When this [ammunition] is added we are convinced that a rational juror could find Jenkins'

guilt beyond a reasonable doubt."). Even with this additional evidence, we found that the government had "just barely" made its case. *Id.* As such language suggests, we are unwilling to expand that precedent to cover this case.[5]

What is more, 18 U.S.C. § 641 requires not simply that Luther received or concealed stolen property, but that he did so with "the intent to convert it to his use or gain." The record in this case is bereft of any suggestion that Luther intended to convert $225,582.63 worth of electronics — most of which left the house shortly after it was brought in — to his own use or gain. At oral argument, the government indicated that Luther knew that being able to give significant gifts to her relatives made his wife happy. This, however, merely shows that Elizabeth gained something from the crimes, not that her husband did so as well.

In sum, giving due deference to the district court's findings, we must nonetheless conclude that the court erred in determining the relevant conduct and amount of loss attributable to Luther Mellen. We remand for resentencing on the conspiracy and receipt of stolen property counts, and instruct the district court to limit Luther's responsibility to the laptop computer and to any goods he personally used. These goods may include some items found in use in the Mellens' home, but should not include items — such as those that passed through the home and

---

[5] We take the dissent's point about the different standards of proof on conviction and sentencing, *see* Dissent at 7–8, but the issue here is not so much the necessary quantum of evidence as whether there is *any* evidence showing Luther's agreement in the broader aspects of his wife's activities, or his dominion and control over the goods she temporarily stored in their house. Our concern is not the circumstantial nature of the evidence, *see id.* at 4 n.4, but whether that evidence shows agreement as opposed to mere knowledge.

into the hands of Elizabeth's relatives — for which the record contains no evidence of Luther's agreement.

**B.** The district court also increased Luther's sentence by two levels because his crimes involved "more than minimal planning." *See* U.S.S.G. § 2B1.1(b)(4)(A) (2000). The Guidelines call for this adjustment when the crime involves "more planning than is typical for commission of the offense in a simple form." *Id.* § 1B1.1 cmt. n.1(f). More than minimal planning is also present "in any case involving repeated acts over a period of time, unless it is clear that each instance is purely opportune." *Id.* The Guidelines also note that "planning is often related to increased difficulties of detection and proof." *Id.* § 2B1.1 cmt. background. Because a determination of more than minimal planning involves analysis of both law and fact, we give the district court's findings due deference. *United States v. Kim*, 23 F.3d 513, 516–17 (D.C. Cir. 1994).

Limiting our inquiry to the crimes in which Luther Mellen agreed to participate, we affirm the increase for more than minimal planning. The series of transactions relating to the laptop alone involved "more planning than is typical for the commission of the offense in a simple form": Elizabeth Mellen had to place an order with Robert Sweeney, Sweeney had to deliver the computer to Elizabeth or her home (in exchange for which she allowed him to bill his time to DOE), and Luther had to take the computer and deliver it to his son in North Carolina. Luther even participated in the concealment of the laptop: when he found out that the family was under investigation, Luther instructed his son not to "be around" the computer, as a result of which his son hid it in the mountains of North Carolina. Trial Tr., Nov. 4, 2002 (A.M.) at 65. In addition to the laptop, Luther also sent his son several power cords, which were also paid for by DOE. *See id.* at 52–53. In light of all this, we cannot say that the district court erred in applying the two-level increase.

**C.** Given our remand on the amount of loss, we need not reach Luther's request for a downward departure. That request was based on an assertion that the district court's finding on the amount of loss overstated Luther's involvement in the crimes. At any rate, we note that a district court's decision not to depart downward is reviewable only if the district court misconstrued its authority to depart. *Pinnick*, 47 F.3d at 439. The record before us does not suggest that the court did so.

As for Luther's request for a mitigating role adjustment under Section 3B1.2 of the Guidelines, we note that such adjustments are proper only when the defendant is "plainly among the least culpable" or "less culpable than most other participants." U.S.S.G. § 3B1.2 cmt. nn.1 & 3 (2000). Here, the district court reasonably could have found Luther as culpable as several other small-scale participants in this large-scale conspiracy.

Finally, we turn to Luther's contention that the district court improperly imposed a fine. Under the Guidelines, the court must impose a fine unless the defendant is unable to pay one. U.S.S.G. § 5E1.2(a) (2000). We review the court's finding on ability to pay only for clear error. *United States v. Mastropierro*, 931 F.2d 905, 907 (D.C. Cir. 1991). Here, the court found that Luther had an ability to pay based on his government pension — which he apparently retained — and his assets at the time of sentencing. *See* Sentencing Hr'g Tr. at 26–31. We see no reason to overturn this finding. We note, however, that the amount of the fine will be affected by the court's redetermination of the amount of loss — *see* U.S.S.G § 5E1.2(c)(3) (2000) — and the district court should alter the fine accordingly.

**IV.**

"The extent of a defendant's vicarious liability under conspiracy law is always determined by the scope of his agreement with his co-conspirators." *Saro*, 24 F.3d at 288. Here, the district court found a husband vicariously liable for all the stolen property his wife temporarily stored in their home, without evidence that he agreed to join in his wife's criminal activity to that extent. Such a finding threatens to turn all spouses into co-conspirators because of their agreement to marry — not because of their agreement to participate in a particular conspiracy. We require more specific evidence of guilt, and accordingly remand for resentencing based only on the crimes in which the husband agreed to participate.

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting in part:

In reversing the district court's determination at sentencing regarding Luther Mellen's responsibility for the value of all of the stolen goods that entered the Mellen house, the majority has confused the bonds of matrimony with the conduct of co-conspirators. Luther Mellen (Luther) was convicted of conspiracy to defraud the government not because he married Elizabeth Mellen but because he decided willfully and knowingly to participate in the criminal conspiracy she directed. Despite my brethren's apparent sympathy for Luther's accommodating marital attitude,[1] the fact that Luther may merely have wanted to please his wife[2] does not alter the well-established law governing the scope of a co-conspirator's "relevant conduct" under the United States Sentencing Guidelines (U.S.S.G. or Guidelines). In describing Luther's culpability as guilt by association rather than as the common accountability of a co-conspirator, I believe the majority makes two mistakes: first, it fails to apply the correct standard of review to the trial court's critical finding of fact, a finding anchored by the trial evidence; second, it misapplies the law regarding a co-conspirator's "relevant conduct" under the Guidelines. Accordingly, while I join in Parts I, II, III.B, III.C and IV of the majority opinion, I dissent from Part III.A.

The Guidelines authorize the district court to include in a co-conspirator's "relevant conduct" "all reasonably foreseeable acts and omissions of others in furtherance of the

---

[1] Maj. Op. at 16.

[2] Sentencing Tr., Aug. 5, 2003 [1:30 PM] at 32.

jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (2000). The Commentary instructs the trial court to "determine the scope of the criminal activity the particular defendant agreed to jointly undertake" and to consider "all reasonably foreseeable quantities of contraband that were within the scope, of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 cmt. n.2 (2000). The issue, then, as the majority correctly pinpoints, is the scope of the conspiratorial agreement between Luther and his wife, Elizabeth. To determine scope the sentencing court must decide whether the evidence established a single conspiracy of which the defendant was a part or multiple conspiracies, only some of which the defendant took part in. *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995). The determination of scope is the responsibility of the trial court. *United States v. Edmond*, 52 F.3d 1080, 1105 (D.C. Cir. 1995) ("[T]he logic of [the precedent] requires the District Court, not us, to determine the proper scope of agreement…."). If the trial court fails to make findings regarding the scope of a defendant's involvement in a conspiracy, we ordinarily remand the case to permit it to do so. *Childress*, 58 F.3d at 726; *Edmond*, 52 F.3d at 1105; *United States v. Anderson*, 39 F.3d 331, 359 (D.C. Cir. 1994); *United States v. Saro*, 24 F.3d 283, 290-92 (D.C. Cir. 1994).

Here the district court *did* make the crucial finding as to the scope of the conspiracy at the sentencing hearing. After considering the arguments of counsel, the trial evidence and the pre-sentence report, the trial judge determined that Luther's culpability encompassed all of the property that flowed through the Mellen house, concluding, "$225,582.63, is indeed the value of the property that Mr. Mellen is responsible for in the criminal activity, because he knew that

the property was there. He knew of his wife's involvement in this scheme. I have no doubt about that whatsoever." Sentencing Tr., Aug. 5, 2003 [1:30 PM] at 18. The majority decides that this finding of fact is subject to the "due deference" standard of review, citing *United States v. Jackson*, 161 F.3d 24 (D.C. Cir. 1998) ("[A] district court's application of the Guidelines to the facts must be given 'due deference….'"). Maj. Op. at 12. I respectfully disagree that "due deference" is the correct standard of review. The trial judge made an unvarnished finding of fact which we do not disturb unless it is "clearly erroneous." *See United States v. (Elizabeth) Mellen*, 89 Fed. Appx. 268 (D.C. Cir. 2004) ("[I]n reviewing sentences the court … 'shall accept the findings of fact of the district court unless they are clearly erroneous….'" (quoting 18 U.S.C. § 3742(e))); *see also United States v. Spriggs*, 102 F.3d 1245, 1262 (D.C. Cir. 1996) (per curiam). The district court first found that Luther participated in the conspiracy with respect to all of the goods that passed through the Mellen house. It then decided how to apply section 1B1.3 of the Guidelines. *Childress*, 58 F.3d at 722 (scope of conspiratorial participation "depends on factual findings" (internal quotation marks omitted)).

The record here manifests that the trial court's factual finding as to the scope of Luther's involvement is anything but clearly erroneous. Luther was convicted of conspiracy to defraud the government by "causing Elizabeth C. Mellen … to obtain computers, telephones, cameras, [and] other electronic equipment … for the personal use of the coconspirators." Grand Jury Indictment (June 17, 1999) at 7. Some of the goods stolen as part of that conspiracy were delivered to the Mellen house to be distributed to Luther's wife's relatives. Other goods were in use or in plain view in

the Mellen house. Trial Tr., Oct. 28, 2002 [A.M.], at 91-108.[3] Luther was present at times when some of the goods were distributed to other family members. Trial Tr., October 30, 2002 [A.M.], at 6.[4] Although the district court's finding is terse, I believe that necessarily implied in its words is the finding that Luther, knowing of his wife's fraudulent activity taking place in their house, did nothing to disassociate himself from it.[5] After all, the trial judge heard the same evidence the

---

[3] An additional $140,000 worth of stolen property never passed through the Mellen residence.

[4] How the majority, facing these facts, can question "whether there is *any* evidence showing Luther's agreement in the broader aspects" of the conspiracy is beyond me. Maj. Op. at 18 n.5 (emphasis in original). The evidence may be circumstantial but it is nonetheless undeniable. "[T]he law has no preference for direct evidence over circumstantial and often it is the latter that is the more reliable." *United States v. Spinner*, 152 F.3d 950, 963 (D.C. Cir. 1998) (internal citation omitted).

[5] The majority notes that the jury found Luther guilty of receiving stolen property "having a value of more than $1000." Maj. Op. at 6. The verdict form included no specific property value on the conspiracy count. *Id*. The receipt/stolen property count's allusion to "more than $1000" merely tracks the language of 18 U.S.C. § 641 and indicates nothing about the jury's view of the *extent* of Luther's involvement in the conspiracy. The jury was, however, in possession of the indictment. Trial Tr., November 6, 2002 [A.M.] at 148. The receipt/stolen property count charged Luther with *all* of the property — $225,000 worth — that passed through the Mellen

jury had in convicting Luther and, having heard it, he had "no doubt … whatsoever" of Luther's participation in the conspiracy.[6] The court even allowed for the testimony about keeping Luther "in the dark" by limiting Luther's responsibility to the goods delivered to the house — some $225,000 worth — as opposed to the entire $365,000 worth of goods involved in the fraud.[7] Having made a permissible

---

house during the conspiracy. Grand Jury Indictment at 32–34 (June 17, 1999). The conspiracy count charged that Luther and the other co-conspirators "willfully combined, conspired, confederated, and agreed with each other … to defraud the United States" and described Luther's involvement within the entirety of the conspiracy. *Id*. at 6–31.

[6] I do not, as the majority suggests, Maj. Op. at 14 n.3, understand the district court's comment to equate knowledge with participation. Rather, I think the statement — "He knew of his wife's involvement in the scheme. I have no doubt about that whatsoever."— was the court's shorthand finding, in light of all of the evidence it had heard throughout the trial, that Luther both knew about, and participated in, the conspiracy involving all of the goods that passed through the Mellen house.

[7] The jury may have found the testimony regarding Elizabeth's effort to shield Luther from the full scope of the conspiracy lacking in credibility. Robert Sweeney testified that he was unable to comply fully with Elizabeth's instructions to conceal any goods delivered to the Mellen house "so Butch [Luther] would not be able to see them." Trial Tr., October 29, 2002 [A.M.], at 58. Sweeney further testified that Elizabeth "didn't want anyone to know about the deliveries," including

finding as to scope, the trial judge's application of the Guidelines is unremarkable and plainly worthy of "due deference": it was reasonably foreseeable to Luther that all of the goods delivered to and passing through the house in which he resided furthered the conspiracy of which he was a part.

To support its conclusion the majority cites several cases involving circumstances in which a defendant has been deemed a co-conspirator based on activities taking place in his house. *See United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998); *United States v. Ronald Jenkins*, 78 F.3d 1283, 1286 (8th Cir. 1996); *United States v. Rice*, 1992 WL 240686 at *5 (4th Cir. 1992) (unpublished opinion); *cf. United States v. Morillo*, 158 F.3d 18, 23-24 (1st Cir. 1998). These cases provide more support for the proposition that the entire amount of property passing through the Mellen house was reasonably foreseeable to Luther than they do for the majority's more limited view of "foreseeability." First, each of these cases involved a sufficiency of the evidence challenge to a conspiracy *conviction*, not a challenge to the determination of "relevant conduct" at sentencing where the applicable burden of proof is simply a preponderance of the evidence. *United States v. Stover*, 329 F.3d 859, 871 (D.C. Cir. 2003). Moreover, each of the *Brito*, *Jenkins* and *Rice* defendants, like Luther, had participated in the conspiracy beyond merely acquiescing in the use of his house. *Brito*, 136 F.3d at 409 (defendant "actively participated in the storage of marihuana"); *Ronald Jenkins*, 78 F.3d at 1286 (defendant

---

Lewis Morgan. This instruction was — to put it mildly — improbable because, as Elizabeth well knew, Lewis Morgan helped Sweeney *deliver* the stolen goods. *Id*. at 59–60.

"assisted in the accounting of drug proceeds"); *Rice*, 1992 WL 240686 at *6 (evidence sufficient to infer defendant's participation in the conspiracy). In *Morillo*, another challenge to a conspiracy conviction, the court reversed the conviction because there was "no evidence of any involvement [by the defendant] in any other aspect of the conspiracy" aside from lending his apartment to the conspirators. *Morillo*, 158 F.3d at 23. That is not the case here. Even more distinguishable, the defendant in *Morillo* no longer lived in the apartment when the conspiratorial acts occurred there. *Id*. at 24. Finally, unlike the *Morillo* court, we are affirming Luther's conspiracy conviction.

The majority also attempts to distinguish our own precedent of *United States v. Sylvia Jenkins*, 928 F.2d 1175 (D.C. Cir. 1991). Jenkins lived with her son and was convicted along with him and others of conspiracy to possess cocaine. There was no evidence of her involvement in the conspiracy other than her residing in the house (which she owned) where the cocaine was seized and the discovery of ammunition in her bedroom. We declared that the "natural inference is that those who live in a house know what is going on inside, particularly in the common areas." *Id*. at 1179. Sylvia Jenkins's possession of ammunition permitted the inference that she was involved in the drug conspiracy and we affirmed her conviction. *Id*. Here Luther's participation in the conspiracy — obtaining his son's laptop — permits the same inference with respect to the other goods delivered to the Mellen house. The majority is right to distinguish *Jenkins* but for the wrong reason. *Jenkins* involved a conspiracy *conviction*, not a sentencing calculation. The majority's reluctance "to expand [*Jenkins*] to cover this case," Maj. Op. at 18, is therefore unfounded: if the government "'just barely'

made its case" at trial to prove Jenkins's guilt beyond a reasonable doubt, *id*. (quoting *Jenkins*), it requires no expansion to affirm the trial court's "relevant conduct" determination regarding Luther supported by the lesser preponderance of the evidence standard applicable at sentencing.

Moreover, "a conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence." *Brito*, 136 F.3d at 409. The majority minimizes the evidence of the closeness of Luther and Elizabeth's marriage as manifesting a weakness in the government's position, Maj. Op. at 16, and ignores the other circumstantial evidence linking Luther to the goods passing through the house, including Luther's request that Elizabeth obtain Motorola two-way radios for their use, coupled with his presence at a family gathering where Elizabeth distributed similar radios to her relatives, the many times when driving to or from work together that Luther and Elizabeth retrieved stolen goods from Elizabeth's sister's vehicle, as well as the sheer quantity of goods recovered from throughout the house on the day of the police raid.[8]

In its decision to limit Luther's involvement, the majority assumes without discussion that there were multiple

---

[8] *See* Trial Tr., October 28, 2002 [A.M.], at 91–108 (volume of goods found at Mellen home); Trial Tr., October 29, 2002 [P.M.], at 127–28 (goods placed in Elizabeth's sister's vehicle); Trial Tr., October 30, 2002 [A.M.], at 5–7 (distribution of two-way radios to Elizabeth's relatives); *id*. at 8–9 (retrieval of goods from Elizabeth's sister's vehicle); Trial Tr., October 30, 2002 [P.M.], at 43–45 (Luther and Elizabeth's discussion about two-way radios for personal use).

conspiracies at work: one between Elizabeth and Luther to defraud the government of the laptop obtained for Luther's son; another between Elizabeth and Luther to defraud the government of electronics for their personal use at their house; another involving the distribution of goods from their house — as well as the storage of goods there — of which Luther was not a part; and still others of which Luther was not a part in which no goods passed through the house. *See* Maj. Op. at 14. Although the record may permit such an assumption, it does not require it. The majority treats the record as if it were insufficient as a matter of law to hold Luther accountable for all of the goods that passed through the house. Instead of allowing the district court on remand to "spell out" its findings as to the scope of Luther's involvement, *Childress*, 58 F.3d at 722, the majority erroneously constrains the district court's role as fact-finder.[9]

Unlike the federal tax code, the criminal law permits neither a marriage penalty nor a marriage bonus. *See* Joint Committee on Taxation, Description of the Marriage Tax Penalty Relief Act of 2000, JCX-3-00 (Jan. 31, 2000). The majority has handed Luther the equivalent of a refund check. It makes the hyperbolic assertion that holding Luther accountable for all of the goods distributed from the Mellen house "threatens to turn all spouses into co-conspirators because of their agreement to marry — not because of their

---

[9] Although I would affirm outright the district court's "relevant conduct" determination, I believe a remand should at least leave the trial court free to "spell out" that the $225,000 worth of stolen property that passed through the Mellen house was reasonably foreseeable to Luther.

agreement to participate in a particular conspiracy." Maj. Op. at 21. Luther was a convicted co-conspirator, not an "innocent spouse." At sentencing, the government must "proffer sufficiently reliable evidence to support its factual assertions as to the scope of a defendant's conspiratorial agreement" to count co-conspirators' acts as part of the defendant's "relevant conduct." *United States v. Booze*, 108 F.3d 378, 381 (D.C. Cir. 1997). Here the district court was "entitled to rely on the trial record references cited by the government." *Id.* at 384. That evidence should easily allow us to uphold the trial court's finding that Luther's "relevant conduct" included the value of all of the goods flowing through the Mellen house. While the evidence may not fit the Homeric ideal of which the majority speaks, Maj. Op. at 16, I believe it *is* sufficient to conclude that the Mellens kept both their household and their conspiracy with "oneness of mind."

For the foregoing reasons, I respectfully dissent from Part III.A of the majority opinion.